[No. C022259. Third Dist. Jan. 31, 1997.]

FEMINIST WOMEN'S HEALTH CENTER et al., Petitioners, v.
THE SUPERIOR COURT OF SACRAMENTO COUNTY, Respondent;
CLAUDIA JENKINS, Real Party in Interest.

■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■

**COUNSEL**

Dickstein & Merin, Mark E. Merin and Cathleen A. Williams for Petitioners.

No appearance for Respondent.

Driver, Driver & Hunt and Jeffrey A. Hunt for Real Party in Interest.

**OPINION**

**PUGLIA, P. J.**—The issue presented by this petition is whether a female health center employee who agrees voluntarily to demonstrate a cervical self-examination to female clients and employees at the health center may sue the health center (and several of its supervisory employees) because the self-examination violates her constitutional right to privacy.

Respondent superior court granted summary adjudication of all of plaintiff Claudia Jenkins's claims except the one alleging she was wrongfully terminated from employment in violation of her right to privacy. The defendants—Feminist Women's Health Center (Center) and several of its employees—filed the instant petition seeking a writ to compel the superior court to adjudicate this remaining claim in their favor. We shall order the writ to issue.

■ Review of a summary judgment (or summary adjudication) motion by a Court of Appeal involves the same three-step process required of the trial court. (*AARTS Productions, Inc.* v. *Crocker National Bank* (1986) 179 Cal.App.3d 1061, 1064 [225 Cal.Rptr. 203].) "First, we identify the issues framed by the pleadings since it is these allegations to which the motion must respond by establishing a complete defense or otherwise showing there is no factual basis for relief on any theory reasonably contemplated by the opponent's pleading. . . . [¶] Secondly, we determine whether the moving party's showing has established facts which negate the opponent's claim and justify a judgment in movant's favor. . . . [¶] When a summary judgment motion prima facie justifies a judgment, the third and final step is to determine whether the opposition demonstrates the existence of a triable, material factual issue." (*AARTS Productions, Inc., supra*, 179 Cal.App.3d at pp. 1064-1065, citations omitted.)

 Where the superior court's ruling on summary judgment will result in a trial on nonactionable claims, a writ of mandate will lie to preserve the resources of the court and the parties. (Code Civ. Proc., § 437c, subd. (*l*); *Hansra* v. *Superior Court* (1992) 7 Cal.App.4th 630, 637-638 [9 Cal.Rptr.2d 216].)

Plaintiff filed her complaint on May 17, 1994. It included a cause of action for wrongful termination in violation of public policy. The Center was a named defendant, as were Shauna Heckert, Dido Hasper, Lisa Williams, and Eileen Schnitger (employee defendants). The employee defendants were named because they were subject to suit under the California Fair Employment and Housing Act. (Gov. Code, § 12900 et seq.)[1]

Plaintiff alleged: She was hired by defendants as a health worker pursuant to an oral contract entered in August 1993; defendants mandated that all female employees disrobe and display their vaginas to the employee defendants and various other employees; those who refused were advised that they either would be fired or would not receive promotions or raises; plaintiff refused to disrobe and was transferred to an intake clerk position before being terminated from employment on January 6, 1994; defendants' policy violated plaintiff's right to privacy and her right freely to maintain and practice religious and cultural beliefs as they pertained to the treatment and care of her body.

Defendants moved for summary judgment of plaintiff's complaint and summary adjudication of its individual causes of action. Defendants' motion was supported by multiple declarations, which we now review.

Defendant Dido Hasper, executive director of the Center, declared that the Center was founded as a nonprofit corporation in Chico in 1974. The Center was created because unmarried women found it difficult to obtain abortion and midwifery services as well as information regarding birth control, adoption and reproduction. The Center was inspired by the existence of similar centers in Los Angeles and Oakland. The Chico Center began offering services in 1975, including abortion services, pregnancy screening, well-woman gynecology, family planning, and a speakers' bureau on women's health topics. The Center expanded and presently has four clinics, located in Chico, Sacramento, Santa Rosa, and Redding.

[1]Plaintiff's first cause of action alleged a breach of the implied covenant of good faith and fair dealing. The second alleged intentional infliction of emotional distress. In the third cause of action, a violation of the California Fair Employment and Housing Act was alleged. In the fourth cause of action—which is the only one at issue herein—plaintiff alleged wrongful termination in violation of California public policy (violation of privacy). There also was a supernumerary "fourth cause of action," for a civil conspiracy.

Hasper's declaration discussed self-help groups at which cervical self-examination was demonstrated. Hasper defined a self-help group as a gathering of women who want to learn more about their bodies and reproductive health care. She declared: "The goal is to give women the opportunity to talk to each other, share experiences, learn from each other, and learn about their own bodies. A common realization of participants in self-help groups is that women's bodies and their normal reproductive functions have been medicalized and remain a mystery to them. The goal of self-help is to demystify and redefine the normal functions of a woman's body. Our unique and effective, although not strictly necessary tool to accomplish this is for women to visualize their own cervixes and vaginas, which are not usually seen with the naked eye without the use of a vaginal speculum. In many, but not necessarily all, self-help clinic sessions, women are given the opportunity to learn how to use a plastic speculum. . . . [¶] The Health Center offers self-help 'clinics' as a community education service to other women's groups, high school and college classes, and makes self-help group facilitators available for any appropriate gathering of interested women. . . . [¶] When self-examination occurs in a self-help group, two customs are observed. A woman does self-examination only if and when she feels comfortable doing so, and she looks at her own cervix first before any of the other participants in the self-help group."

Hasper declared that the position of "feminist health worker" (for which plaintiff was hired) was a unique one, requiring, at a minimum, "a great deal of empathy and training, strict absence of judgmentalism, a sophistication to react to a variety of clients' circumstances in a calm, respectful manner, and the ability to think on one's feet and appropriately respond to the needs of Health Center clients."

Hasper further declared that an element of the health worker's training process was an orientation to the self-help educational process. A senior health worker or director presides over the orientation, which includes a slide show about the history of the women's self-help movement and self-examination. Self-examination of the cervix thereafter is demonstrated for those attendees who express an interest. A plastic speculum is used to observe the cervix, and attendees are given the opportunity to take one home to examine themselves. Hasper concluded: "It is not the goal of self-help or of the Health Center, nor is it possible, to compel or require any woman to do self-examination of her own cervix. [¶] . . . Many senior health workers become facilitators for self-help clinics, although this too is not a job requirement. It has been the Center's experience that those health workers who are genuinely enthusiastic about the concept of self-help, if they possess

the other qualities stated above, become outstanding staff members, embracing the goals of their organization. [¶] . . . A health worker cannot perform as a woman's advocate during the abortion process at the Health Center's standard if she has a strong aversion to the self-help concept."

Defendant Lisa Williams, the clinic manager for the Center's Sacramento office in August 1993, submitted a declaration detailing the circumstances of plaintiff's employment. Williams declared that plaintiff was hired as a health worker at the Center's Sacramento branch in August 1993. Williams interviewed plaintiff and explained the role of the health worker in the abortion clinic. She gave plaintiff a copy of the health worker job description, which plaintiff read and acknowledged reading. Williams detailed the training program for health workers. She explained the self-help philosophy of the clinic and that health workers, as part of their training, would be oriented to self-help and invited to participate in a self-help clinic. In October 1993, several months after plaintiff had been hired, plaintiff applied for a vacant position of intake clerk. Williams explained to plaintiff that she would have to undergo a new interview process for the intake clerk position, since a different supervisor was involved. Williams declared that plaintiff never expressed dissatisfaction with self-help, even though she had many opportunities to do so at regularly scheduled staff meetings where dissent was encouraged. Williams declared that she did not participate in the decision to hire or fire plaintiff from the intake worker position.

Appended to Williams's declaration is a hiring interview form, signed by plaintiff, which states in part: "I have read and understand the job description for the position I am being hired. [*sic*] [¶] I have read and understand the Personnel Policies of the Feminist Women's Health Center."

The health worker job description which plaintiff reviewed also was appended. Under "qualifications" for the health worker position, two of the qualifications emphasize self-help:

"1. Must attend Orientation and Self-Help demonstration

"2. . . . . . . . . . . . . . . . . . . . . . . . .

"3. Must have an interest in women's healthcare and Self-Help"

Under the heading "responsibilities and duties" in the health worker job description, participation in self-help clinics and the demonstration of the self-cervical exam at those clinics is explicitly stated:

"1. *Attends and conducts self-help clinics as assigned.*

"2. . . . . . . . . . . . . . . . . . . . . . . . .

"3. . . . . . . . . . . . . . . . . . . . . . . . .

"4. Is a Healthworker for drop-in pregnancy screening and pregnancy screening groups as scheduled:

"a. Facilitates pregnancy screening groups.

"b. *Demonstrates self cervical exam to pregnancy screening groups.*

"c. Counsels clients about pregnancy screening.

"d. Makes appropriate referrals for clients.

"e. Performs UCG pregnancy test or early urine pregnancy tests for clients.

"f. Acts as an advocate during exams by the medical professional as needed." (Italics added.)

According to excerpts from plaintiff's deposition, plaintiff stated that intake workers did not have to participate in self-help, but health workers, on the other hand, were required to participate. Plaintiff believed she was terminated because she refused to perform self-help. Plaintiff and fellow employee Kimya Lambert were terminated soon after several employees delivered an anonymous letter to defendant Shauna Heckert, the Center's assistant director. According to plaintiff, the letter requested that "they stop pressuring people to do the self-help as it made people feel very uncomfortable and that they could get into some legal matters or something in regards to that." Plaintiff stated that she never was reprimanded or given any warnings before being terminated.

The unsigned letter to which plaintiff referred was attached to the moving papers. The letter states that the Center had made a special effort to employ women of different racial and cultural backgrounds, but that participation in self-help clinics was contrary to their cultural values, and this dichotomy explained and justified the opposition to self-examination at the self-help clinics.

Defendant Shauna Heckert submitted a declaration in which she declared that intake workers are not required to perform self-help and that she had no input into the hiring or firing of plaintiff.

Defendant Eileen Schnitger, the Center's director of education and training, submitted a declaration stating she did not participate in any way in the hiring and firing of plaintiff.

Defendants argued that their evidence establishes that plaintiff's wrongful termination cause of action lacks merit because plaintiff, as an at-will employee, was subject to reasonable conditions of employment, of which cervical self-examination was one.

In order to rebut defendants' showing that plaintiff understood and expressly agreed to demonstrate cervical self-examination, plaintiff's opposition papers explain the circumstances surrounding self-help and how she was pressured into demonstrating it. Plaintiff declared that during her employment interview "I was not told it was mandatory to disrobe and insert a speculum in my vagina in front of a group of health workers." At a September 1993 self-help session (one month after she was hired), plaintiff was instructed by defendant Eileen Schnitger to disrobe and insert a speculum in her vagina. Plaintiff refused. After further refusals, defendant Lisa Williams instructed plaintiff that she was required to participate in self-help. In October 1993, plaintiff applied for an intake clerk position because it was her understanding that it would not require participation in self-help, although she wasn't sure. Plaintiff became an intake worker on November 1, 1993, at the same rate of pay she had received as a health worker. Tensions were high at this time due to the self-help controversy. Plaintiff and fellow employee Kimya Lambert tried to defuse the problem by suggesting less personally intrusive methods such as using mannequins or privately inserting the speculum and then discussing results in the group sessions. Defendant Eileen Schnitger steadfastly refused these alternatives.

In December 1993, at the insistence of plaintiff and others, volunteer nurse Maggie Gunn wrote the anonymous letter referred to previously. Gunn and another employee, Shirley Anderson, quit soon thereafter because of the self-help mandate. Plaintiff and Kimya Lambert were fired because of their work performance. Plaintiff's declaration concluded: "I believe and continue to believe 'self-help' in general has no relation to my position as a health worker because as a health worker I did not counsel clients about 'self-help.' I merely assisted in the abortion process. In fact, many of the movies we viewed at 'self-help' meetings featured issues such as how to climax and I know for certain I was not going to discuss this with any abortion client. I had a very difficult time sitting through these movies about climaxing but did so to preserve my job. I had to draw the line, although, at the request to disrobe in front of a group of people."

Shirley Anderson, employed as a nurse and health worker at the Center from May 1993 to January 1994, submitted a declaration in which she declared that she was not informed that she would have to disrobe in front of people as part of self-help. It was only after a few sessions that Eileen

Schnitger clarified that self-examination was a job requirement. Lisa Williams told her she would receive no raises or promotions unless she participated in self-examination.

Several of the employees who refused to disrobe approached Maggie Gunn and asked her to write a letter expressing their concerns, which she did. Shortly thereafter plaintiff and Lambert were fired. Anderson, believing she was next in line, quit.

Kimya Lambert submitted a declaration in which she echoed plaintiff's view of the evidence.

In plaintiff's points and authorities filed in opposition to the motion, she clarified that her wrongful termination claim was premised on defendants' purported violation of her constitutional right to privacy. (Cal. Const., art. I, § 1.)

In its tentative ruling, the superior court indicated it would grant summary adjudication of plaintiff's cause of action for wrongful termination in violation of public policy. Summary adjudication of several other claims was tentatively denied, as was the summary judgment motion. After further briefing, the court revised its tentative ruling to grant summary judgment for defendants, largely on the basis of plaintiff's at-will employment status. At the hearing on the motion the court disavowed its tentative ruling. The court granted summary adjudication as to all claims except the one for wrongful termination in violation of public policy, and as to that, "limited [it] to the exception with regard to a contention of discharge in invasion of the right of privacy."

Defendants moved for reconsideration on the ground there was no material dispute that plaintiff's termination did not violate her right to privacy. For the purposes of the motion, defendants accepted plaintiff's allegations that she was terminated as an intake worker because of previously expressed refusal to participate in self-examination in group self-help sessions. Defendants argued that such a violation of plaintiff's right to privacy could not be shown under the applicable standard set forth in *Hill* v. *National Collegiate Athletic Assn.* (1994) 7 Cal.4th 1 [26 Cal.Rptr.2d 834, 865 P.2d 633].

The court concluded its ruling was correct and thereby denied the reconsideration motion. Thereafter the instant petition was filed, and we issued a stay.[2]

---

[2]According to the Center, the self-help and self-examination practices are central to the feminist women's health movement and have been described and discussed extensively in

I

■ Defendants argue there can be no liability of the Center or its employees for terminating an employee who, having been hired as a health worker whose duties included the demonstration of cervical self-examination before groups of women, objected to and refused to perform that job duty. Defendants argue it was undisputed that the written job description for the health worker position for which plaintiff was hired expressly states that cervical self-examination is a job duty of the health worker. In defendants' view, the trial court ignored this express agreement and also failed to engage in the balancing analysis required in cases involving an alleged violation of the constitutional right to privacy. Defendants posit that the court's denial, pro tanto, of their summary adjudication motion cripples the Center's health education program and threatens the Center's existence by giving every health worker the right to sue for damages for violation of privacy rights.

Plaintiff responds that these arguments are specious as the superior court's order "does not prohibit or eliminate anything nor declare anything illegal." Plaintiff contends that summary adjudication was properly denied based on the existence of a number of disputed issues, namely: whether there was a self-help program in effect during plaintiff's employment; whether such a program included cervical self-examination; whether cervical self-examination was a vital part of the self-help program; whether the cervical self-examination required employees to disrobe in front of other females; whether an employee had the right to refuse to perform cervical self-examination; and whether the Center's interest outweighed plaintiff's right to privacy.

■ An action for wrongful termination of employment in violation of public policy may lie if the employer conditions employment upon required participation in unlawful conduct by the employee. (*Foley* v. *Interactive Data Corp.* (1988) 47 Cal.3d 654, 666 [254 Cal.Rptr. 211, 765 P.2d 373], citing *Tameny* v. *Atlantic Richfield Co.* (1980) 27 Cal.3d 167, 178 [164 Cal.Rptr. 839, 610 P.2d 1330, 9 A.L.R.4th 314].) In order to prevail, the employee must show that the termination is against public policy and affects a duty which inures to the public at large rather than to a particular employer or employee. (*Foley, supra,* 47 Cal.3d 654, 669.) The public policy must have a basis in either a statutory or constitutional provision. (*Gantt* v. *Sentry Insurance* (1992) 1 Cal.4th 1083, 1095 [4 Cal.Rptr.2d 874, 824 P.2d 680].)

The public policy invoked by plaintiff consists of the right to privacy embodied in article I, section 1 of the California Constitution, which declares: "All people are by nature free and independent and have inalienable

---

books published by the Center. The Center asks that we judicially notice three of these works, which they have appended to their petition. As these materials were not submitted to the superior court, and thus played no part in the disposition of the motion, we deny the request.

rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy."

In *Semore* v. *Pool* (1990) 217 Cal.App.3d 1087 [266 Cal.Rptr. 280], the Court of Appeal held that a demurrer was improperly sustained to a cause of action for wrongful termination based upon an employee's refusal to submit to a pupillary eye reaction test designed to measure drug influence. In *Luck* v. *Southern Pacific Transportation Co.* (1990) 218 Cal.App.3d 1 [267 Cal.Rptr. 618], the Court of Appeal upheld a wrongful termination verdict in favor of a nonsafety employee who refused to submit to a urinalysis drug test. As in the present case, the public policy supporting the employee's claim was the constitutional right to privacy. These cases therefore lend support to plaintiff's claim that the constitutional right to privacy forms a sufficient touchstone of public policy to support her wrongful termination claim.

Defendants do not dispute this. Their argument, rather, is that there is no material factual dispute that their conduct did not violate plaintiff's right to privacy.

The principal case discussing the elements of a violation under California's constitutional privacy provision is *Hill* v. *National Collegiate Athletic Assn., supra,* 7 Cal.4th 1 (hereafter referred to as *Hill*).[3]

In *Hill*, university students brought an action against the National Collegiate Athletic Association (NCAA) challenging the NCAA's drug testing

---

[3]In footnote 20 of the *Hill* decision, the Supreme Court summarized the *Semore* and *Luck* decisions, and a third employee drug test case, *Wilkinson* v. *Times Mirror Corp.* (1989) 215 Cal.App.3d 1034 [264 Cal.Rptr. 194]. The court expressed no opinion whether these cases were correctly decided, but it stated that the analyses in these cases had been superseded by the analytical framework announced in *Hill*. The court wrote: "In light of our general discussion of the elements of invasion of privacy (which differs from the approaches taken in these cases) and the fact-specific character of this drug testing case (which involves extracurricular sports activity rather than employment), we offer no analysis of the continuing vitality of these cases. Like other claims for invasion of the state constitutional right to privacy, future claims arising in the employment context will be subject to the elements and standards we announce here, which require careful consideration of reasonable expectations of privacy and employer, employee, and public interests arising in particular circumstances." (*Hill, supra,* 7 Cal.4th 1, 56, fn. 20.)

The Supreme Court recently applied the analytical framework of *Hill* to workplace drug testing. *Loder* v. *City of Glendale* (1997) 14 Cal.4th 846 [59 Cal.Rptr.2d 696, 927 P.2d 1200], involved a privacy challenge to the City of Glendale's required drug testing by urinalysis of all newly hired persons. The lead opinion concluded that the testing did not violate the job applicants' privacy rights.

program of student athletes. The trial court entered judgment permanently enjoining the NCAA from testing the university's student athletes. The Court of Appeal affirmed. The Supreme Court, however, reversed the judgment of the Court of Appeal because the drug testing program did not violate the California Constitution's right to privacy.

■ The court summarized the elements of a privacy claim and defenses thereto as follows:

"[W]e hold that a plaintiff alleging an invasion of privacy in violation of the state constitutional right to privacy must establish each of the following: (1) a legally protected privacy interest; (2) a reasonable expectation of privacy in the circumstances; and (3) conduct by defendant constituting a serious invasion of privacy.

"Whether a legally recognized privacy interest is present in a given case is a question of law to be decided by the court. [Citations.] Whether plaintiff has a reasonable expectation of privacy in the circumstances and whether defendant's conduct constitutes a serious invasion of privacy are mixed questions of law and fact. If the undisputed material facts show no reasonable expectation of privacy or an insubstantial impact on privacy interests, the question of invasion may be adjudicated as a matter of law.

"A defendant may prevail in a state constitutional privacy case by negating any of the three elements just discussed or by pleading and proving, as an affirmative defense, that the invasion of privacy is justified because it substantially furthers one or more countervailing interests. The plaintiff, in turn, may rebut a defendant's assertion of countervailing interests by showing there are feasible and effective alternatives to defendant's conduct which have a lesser impact on privacy interests. Of course, a defendant may also plead and prove other available defenses, e.g., consent, unclean hands, etc., that may be appropriate in view of the nature of the claim and the relief requested.

"The existence of a sufficient countervailing interest or an alternative course of conduct present threshold questions of law for the court. The relative strength of countervailing interests and the feasibility of alternatives present mixed questions of law and fact. Again, in cases where material facts are undisputed, adjudication as a matter of law may be appropriate." (*Hill*, *supra*, 7 Cal.4th 1, 39-40.)

In *Hill*, the court accepted as given that the NCAA's policy of observing athletes urinate into vials impinged on a legally protected privacy interest. The court further concluded, though, that student athletes had diminished expectations of privacy by reason of their participation in intercollegiate

athletic activities and advance notice of the drug testing. Notwithstanding the diminished expectation of privacy resulting therefrom, the court evaluated the competing interests at stake due to the seriousness of the privacy invasion. The court ultimately concluded that "[t]he NCAA's information-gathering procedure (i.e., drug testing through urinalysis) is a method reasonably calculated ... rther its interests in enforcing a ban on the ingestion of specified s ... in order to secure fair competition and the health and safety of a ... articipating in its programs." (*Hill, supra,* 7 Cal.4th at p. 54.)

Applying the analytical framework of *Hill,* we agree with plaintiff ... observation of the insertion of a speculum into plaintiff's vagina by ... mployees and female clients of the Center infringes a legally pro... privacy interest. This invasion is at least as serious as observing ... n, and we do not question plaintiff's assertions that it was contrary to ... igious and cultural beliefs.

... e reasonableness of plaintiff's expectation of privacy is no greater than ... he *Hill* case, however. In *Hill,* the student athletes had diminished expectations of privacy by reason of occasional communal undress and the sharing of information regarding physical fitness and bodily condition. Two elements of the NCAA's drug testing program further diminished the student athlete's reasonable expectation of privacy: advance notice and the opportunity to consent to testing. The court acknowledged that participation in athletic contests was conditioned on consent to testing, but that this did not render the consent involuntary, since the students did not have a right to participate in such competitions. (*Hill, supra,* 7 Cal.4th at pp. 41-43.)

In the present case, the evidence established that plaintiff agreed to demonstrate cervical self-examination as a job requirement. She signed a form which manifested her understanding of and agreement to fulfill certain job duties. Those duties included participating in self-help and demonstrating cervical self-examinations to pregnancy screening groups.

Plaintiff did not dispute that she had agreed to these employment terms. Her dispute, rather, centered on the meaning of the phrase "demonstrates self-cervical exam to pregnancy screening groups." According to plaintiff's declaration, "I was not told it was mandatory to disrobe and insert a speculum in my vagina in front of a group of health workers." Assuming this statement to be true, it still fails to undermine her agreement to demonstrate cervical self-examinations. Disrobing and inserting a speculum in the vagina is a means by which cervical self-examination is demonstrated. Plaintiff's professed ignorance of the particulars of cervical self-examination does not vitiate her agreement to perform it.

The real issue is whether this type of cervical self-examination may reasonably be required of the Center's employees. In other words, the seriousness of the privacy invasion leads us to the third part of the *Hill* test: consideration of the Center's countervailing interests and the feasibility of the alternatives proposed by plaintiff.

Defendant Dido Hasper, the Center's executive director, stated the following reasons for use of cervical self-examination: "The goal is to give women the opportunity to talk to each other, share experiences, learn from each other, and learn about their own bodies. A common realization of participants in self-help groups is that women's bodies and their normal reproductive functions have been medicalized and remain a mystery to them. The goal of self-help is to demystify and redefine the normal functions of a woman's body. Our unique and effective, although not strictly necessary tool to accomplish this is for women to visualize their own cervixes and vaginas, which are not usually seen with the naked eye without the use of a vaginal speculum. In many, but not necessarily all, self-help clinic sessions, women are given the opportunity to learn how to use a plastic speculum."

It is true, as plaintiff notes, that Hasper's declaration reveals that the job requirement of cervical self-examination varies with the circumstances. These variations give rise to an inference that self-help is not an inflexible part of the Center's self-examination orientation sessions or demonstrations to interested groups.

But the declaration also makes clear that cervical self-examination is important in advancing the Center's fundamental goal of educating women about the function and health of their reproductive systems. Other parts of Hasper's declaration also show that the ability to demonstrate self-examination properly and without reservation identified employees who would be outstanding health care workers and potential group leaders. The declaration implied that the identification and retention of such employees was critical to the continued success of the Center. Considering the Center's expansion since its inception some 20 years ago, it was not unreasonable for Hasper to infer that new clients were drawn to the candid knowledge and intimacy imparted by the Center's unique methods, of which cervical self-examination was one.

The Center also could reasonably conclude that the alternative methods of self-examination proposed by plaintiff would have stifled such candor. These alternatives, such as the use of mannequins, or the private use of the speculum followed by discussion, are pale imitations of uninhibited group cervical self-examination.

It goes without saying that certain individuals would have an aversion to cervical self-examination or other aspects of self-help which were used to advance the Center's goal of shared experiences and learning. Plaintiff, for one, acknowledges that her religious and cultural background was not well suited to the practices of the Center.

In balancing these competing interests, we return to plaintiff's consent to demonstrate cervical self-examination as part of her employment agreement with the Center. The Center was not obligated to hire plaintiff, and consent remains a viable defense even in cases of serious privacy invasions. (*Hill, supra,* 7 Cal.4th 1, 40.) Therefore, we believe the facts as disclosed in the trial court give rise to the following inferences only: The requirement that health workers perform cervical self-examinations in front of other females is a reasonable condition of employment and does not violate the health worker's right to privacy where the plaintiff's written employment agreement evidences her knowledge of this condition and agreement to be bound by it. Where the employee thereafter refuses to abide by the agreement, the employee's wrongful termination claim based on a violation of the right to privacy is rendered infirm. Such is the case under the facts presented, and the superior court should have granted summary adjudication of this claim.

As plaintiff's wrongful discharge claims against the individual employees of the Center depend on her claim against the Center, they necessarily fail as well.

## II

We have complied with the prerequisites for issuance of a peremptory writ of mandate in the first instance. (*Palma* v. *U.S. Industrial Fasteners, Inc.* (1984) 36 Cal.3d 171 [203 Cal.Rptr. 626, 681 P.2d 893].) Let a peremptory writ of mandate issue directing respondent court to set aside its order denying defendants' motion for summary adjudication of plaintiff's wrongful discharge cause of action, and to enter a new and different order granting said motion. Upon our decision becoming final, the stay previously issued is dissolved. Costs are awarded to petitioners.

Sparks, J., and Nicholson, J., concurred.