[No. B034145. Second Dist., Div. Five. May 10, 1990.]

DAVID J. AISENSON, Plaintiff and Appellant, v.
AMERICAN BROADCASTING COMPANY, INC., et al.,
Defendants and Respondents.

148

COUNSEL

David J. Aisenson, in pro. per., Herbert E. Selwyn and Selwyn, Capalbo, Lowenthal & Schacter for Plaintiff and Appellant.

Andrew M. White, Joseph R. Taylor and Christensen, White, Miller, Fink & Jacobs for Defendants and Respondents.

## OPINION

**BOREN, J.**—In 1984, appellant David J. Aisenson filed a lawsuit for slander and invasion of privacy against respondents American Broadcasting Company, Inc., its Los Angeles affiliate KABC-TV, and four KABC-TV employees (collectively, ABC). The lawsuit arose from ABC's broadcast of a series of television news special reports discussing the results of an opinion poll it had conducted. The poll elicited local attorneys' opinions on the performance of Los Angeles Superior Court criminal law judges.[1] ABC reported that appellant, then a superior court judge, had received the lowest ratings of all the judges in the poll.

Appellant alleged that the comments aired on KABC-TV falsely implied that he was an incompetent judge and a "bad guy," that he refused to be interviewed, and that he attempted to suppress the broadcast of ABC's report. These comments, in their entirety, are as follows[2]: Broadcast of October 25, 1983: ". . . The man stepping out of his home is His Honor Judge David Aisenson, the lowest ranking judge of them all. On a one to ten scale, Judge David Aisenson got an overall average score in the four's. Judge Aisenson refused to show himself to you in an interview about the survey, and refused to allow a tv camera into his courtroom. We thought you should at least see his face. Judge Aisenson, in effect, followed the lead of the judge who scored the lowest on KABC's survey six years ago. . . ."

Broadcast of October 27, 1983: ". . . Judge David Aisenson came out with the lowest score of all the judges included in the survey, an overall average score on the 10 point scale of 4.4. When lawyers were asked whether Judge Aisenson knows the law, the answer, 4.2. They gave him the lowest score overall for his sentencing habits, and the lowest score overall for his

---

[1] The poll posed six questions relating to the seventy-seven judges who were being rated: (1) Does he/she have the appropriate demeanor, temperament, courtesy to be a judge? (2) Is he/she usually decisive? (3) Does he/she make efficient use of court time? (4) Does he/she tend to impose appropriate sentences? (5) Does he/she know the law? (6) What overall rating would you give the judge? For each question, the attorneys were asked to rate the judges on a 1-10 scale, where 10 is excellent, and were instructed to evaluate only those judges with whom they had enough experience to form a fair evaluation. As ABC noted in its broadcast, the results were heartening: the average overall score for the judges was seven, indicating that the lawyers who voted were generally satisfied with the quality of the judges being rated.

[2] The report was aired in segments over the course of five evenings, with each segment lasting only a matter of minutes. Appellant was mentioned in three of the five segments.

behavior on the bench. Unfortunately, we can't show you Judge David Aisenson's behavior on the bench. He won't let a television camera in his courtroom, and he won't submit to a television interview about his score as the lowest ranking judge of all those in the 1983 survey.

"Incidentally, Judge David Aisenson is one of those few judges who wasn't put in his job by a governor. He simply ran for judge and was elected. . . ."

". . . And please take a moment to note the names of those other judges who came out relatively low on the survey and refused to let you see and hear them on tv. Judge David Aisenson, the lowest scoring judge of them all. . . ."

Broadcast of November 1, 1983: ". . . Incidentally, the judge with the lowest score for knowing the law is the same one who has the lowest score in most categories. Judge David Aisenson. . . ."

In addition to making the above-quoted statements about appellant, ABC also videotaped appellant as he walked from his home to his car in a manner which, appellant alleged, "[made] it appear as if [he] were a criminal or the subject of some ongoing criminal investigation." Appellant claims that ABC's statements and the videotape, individually and as a whole, are slanderous per se because they suggest that he is dishonest, immoral or otherwise unfit for his profession (Civ. Code, §§ 45, 45a and 46), and that the unauthorized videotaping constituted an invasion of privacy.

In 1987, ABC filed the motion at issue in this appeal, contending that it was entitled to judgment as a matter of law because its publication of the results of the poll was fully protected by the state and federal Constitutions. With regard to appellant's causes of action for libel and slander, ABC argued, among other things, that its statements about appellant were not defamatory, that they constituted protected opinion, and that they were made without malice. ABC asserted that these same factors barred appellant's causes of action for invasion of privacy and, moreover, that its videotape of the plaintiff was true, unaltered, and not offensive to a reasonable person; that the act of videotaping appellant from a public street was a protected news gathering activity; and that no invasion of privacy occurred even in the absence of a constitutional protection.

The trial court granted ABC's motion for summary judgment and dismissed appellant's complaint. This appeal followed.

## DISCUSSION

### 1. *Standard of Review*

■ Appellant asserts that summary judgment is a disfavored remedy which places the burden of proof on the moving party. That is the usual rule, but it does not apply here. The courts have determined that because protracted litigation would have a chilling effect on First Amendment rights, speedy resolution of defamation and invasion of privacy cases is desirable, and summary judgment is a *favored* remedy. Moreover, even where the defendant is the moving party, the burden lies on the plaintiff opposing the motion to affirmatively establish by clear and convincing evidence that a genuine issue of fact exists as to whether actual malice can be proven at trial. (*Anderson v. Liberty Lobby, Inc.* (1986) 477 U.S. 242, 255-256 [91 L.Ed.2d 202, 216, 106 S.Ct. 2505]; *Baker v. Los Angeles Herald Examiner* (1986) 42 Cal.3d 254, 268-269 [228 Cal.Rptr. 206, 721 P.2d 87]; *Reader's Digest Assn. v. Superior Court* (1984) 37 Cal.3d 244, 251-252 [208 Cal.Rptr. 137, 690 P.2d 610]; *Miller v. Nestande* (1987) 192 Cal.App.3d 191, 196-197 [237 Cal.Rptr. 359]; *Wasser v. San Diego Union* (1987) 191 Cal.App.3d 1455, 1461 [236 Cal.Rptr. 772].)

### 2. *Causes of Action for Defamation*

#### a. *There is no evidence that false statements of fact were aired.*

■ Public discussion about the qualifications of those who hold or who wish to hold positions of public trust presents the strongest possible case for application of the safeguards afforded by the First Amendment. (*Ocala Star-Banner Co. v. Damron* (1971) 401 U.S. 295, 300 [28 L.Ed.2d 57, 62, 91 S.Ct. 628].) "When the speech is of public concern and the plaintiff is a public official or public figure, the Constitution clearly requires the plaintiff to surmount a much higher barrier before recovering damages from a media defendant than is raised by the common law." (*Philadelphia Newspapers, Inc. v. Hepps* (1986) 475 U.S. 767, 775 [89 L.Ed.2d 783, 792, 106 S.Ct. 1558].) Accordingly, a public official may not recover damages for a published statement touching upon his fitness for office unless he proves, first, that the defendant made a false statement of fact and, second, that the defendant either knew the statement was false or recklessly disregarded whether it was false or not. (*Id.* at p. 776 [89 L.Ed.2d at p. 792]; *New York Times Co. v. Sullivan* (1964) 376 U.S. 254, 279-280 [11 L.Ed.2d 686, 706, 84 S.Ct. 710, 95 A.L.R.2d 1412]; *Monitor Patriot Co. v. Roy* (1971) 401 U.S. 265, 273-274 [28 L.Ed.2d 35, 41-42, 91 S.Ct. 621].)

Appellant, as a Los Angeles Superior Court judge, was subject to the constitutional limitations on defamation suits by public officials. (*Garrison*

v. *Louisiana* (1964) 379 U.S. 64, 76-77 [13 L.Ed.2d 125, 134, 85 S.Ct. 209]; *Simonson* v. *United Press Intern., Inc.* (7th Cir. 1981) 654 F.2d 478, 481; *Grillo* v. *Smith* (1983) 144 Cal.App.3d 868, 872-873 [193 Cal.Rptr. 414].) He does not deny that these limitations apply to him, but contends that respondents' statements exceeded the boundaries of constitutionally protected speech.

■ The expression by a media defendant of opinion or severe criticism is not defamatory, even though it adversely reflects on the fitness of an individual for public office. (*Yorty* v. *Chandler* (1970) 13 Cal.App.3d 467, 472-473 [91 Cal.Rptr. 709].) "An individual who seeks or accepts public office invites and challenges public criticism so far as it may relate to his fitness and qualifications. . . . The right of criticism rests upon public policy and those who seek office should not be supersensitive or too thin-skinned concerning criticism of their qualifications. . . . In so far as the articles might imply that in the opinion of defendant, plaintiff was unfitted for the office he was seeking to be returned to, no complaint can be made, for defendant had the right to express his opinion in this respect." (*Eva* v. *Smith* (1928) 89 Cal.App. 324, 328-330 [264 P. 803].)

■ The poll in this case reflected the opinions of the attorneys who participated in it, and those opinions are protected regardless of whether they are well founded or utterly wrong. (*Botos* v. *Los Angeles County Bar Assn.* (1984) 151 Cal.App.3d 1083, 1089 [199 Cal.Rptr. 236].) The newscast itself, on the other hand, did not on its face reflect ABC's opinion about the judges in the criminal division; rather, ABC presented the opinions of the attorneys as *facts* and not as editorial comment or criticism. (*Grillo* v. *Smith, supra,* 144 Cal.App.3d 868, 874-875.) ■ Merely making unflattering factual statements about someone, without more, does not give rise to a cause of action for defamation. For these factual statements to be actionable, there must be some proof not only that they tended to impute a lack of professional ability, but also that the objected-to statements were *false*; obviously, a true statement of fact is not defamatory. (Civ. Code, § 46; *Philadelphia Newspapers, Inc.* v. *Hepps, supra,* 475 U.S. 767, 775 [89 L.Ed.2d 785, 792]; *Gregory* v. *McDonnell Douglas Corp.* (1976) 17 Cal.3d 596, 600 [131 Cal.Rptr. 641, 552 P.2d 425].)

■ In this case, there is no evidence that respondents aired false statements of fact. ABC delivered 1,500 ballots to the presidents of three bar associations—the Los Angeles Public Defenders' Association, the Los Angeles Deputy District Attorneys' Association, and the Los Angeles Criminal Courts Bar Association—for distribution to their members. Over 500 completed ballots were returned for tabulation. For this purpose, ABC employed a company which performs public opinion research analyses for

use by the broadcast media. The completed ballots were first key punched onto data processing cards, which were in turn loaded into a computer for analysis. ABC's polling expert recommended that a minimum of 35 responses would ensure that a judge was rated by a statistically valid number of persons in the survey population; as a precaution, ABC only rated those judges who had been evaluated in 50 ballots. Appellant was evaluated by 123 of the attorneys to whom ballots were sent.

Appellant intimates that the facts aired by ABC may have been false because the ballots were tabulated outside the view of respondents or their agents. In the face of respondents' declarations averring that the ballots were properly handled and tabulated, it fell to appellant to present some evidence to the contrary. This he failed to do. He presented absolutely no evidence that the completed ballots were tampered with, or that the data processing cards inaccurately encoded the information contained in the ballots, or that the computer printout did not reflect the opinions expressed by the attorneys being polled. In the absence of any evidence that the ballots and computer tabulations were falsified, we must conclude that ABC's statements conveying to the public the results of the poll were truthful and accurate. The printout itself plainly shows that appellant received the lowest overall score of all the judges whose names appeared on the ballot. Accordingly, none of ABC's statements that appellant received the lowest score in any or most of the categories listed in the ballots is actionable because they are not false statements of fact.

b. *Opinion polls are not restricted to election years.*

Appellant makes much of ABC's statement that the poll was meant to assist the public in the November 1983 judicial election. He contends that this statement is perjurious because judicial elections are only held in even-numbered years. (Elec. Code, § 20.) There are several reasons why this contention is unimportant.

First, the statement in question was not broadcast to the public: it was made in the context of this lawsuit, in ABC's motion for summary judgment. Thus, not only is the statement privileged (Civ. Code, § 47), but also it does not affect a determination of whether the statements which actually were broadcast were defamatory.

Second, the absence of any judicial election in 1983 has no impact on ABC's right to broadcast the results of its opinion poll. Appellant asserts that ABC's report on judges was not newsworthy as it did not concern "a current event of general public interest," meaning an election year. He misperceives the scope of the right to criticize public officials. There is no

rule which limits the exercise of First Amendment rights to the period immediately preceding an election. Surely the competence, honesty and effectiveness of any public official is a matter of unceasing interest in a democratic society, and not just in election years. Recall elections and even impeachment proceedings stemming from misconduct in office are not unknown in this country.

Finally, if respondents were laboring under the misapprehension that their poll would be used by voters the following month (when in fact the election was the following year), their mistake was almost certainly a boon to appellant and any other judge who received a low rating inasmuch as the public would be less likely to recollect these ratings months later.

c. *Hyperbole is not actionable.*

Appellant contends that respondents maligned him by calling him a "bad guy."[3] This argument does not succeed. First, ABC did not state that appellant, specifically, or any other judge being rated, was a "bad guy." Second, even if ABC had stated that appellant was a "bad guy," this could not reasonably be construed as an actionable false statement of fact. Appellant's brief defines "bad guy" as "a cattle thief, desperado, or hired gunman of the old West." By no stretch of the imagination could a reasonable person conclude that by using the term "bad guy" ABC intended to make a factual observation about appellant. At most, it was rhetorical hyperbole, and is therefore not actionable. (*Greenbelt Pub. Assn.* v. *Bresler* (1970) 398 U.S. 6, 13-14 [26 L.Ed.2d 6, 14-15, 90 S.Ct. 1537]; *Baker* v. *Los Angeles Herald Examiner, supra,* 42 Cal.3d 254, 260-261.)

d. *ABC did not suggest that appellant tried to suppress its news report.*

Appellant claims ABC falsely announced that he attempted to suppress its broadcast of the results of the poll. His claim is contradicted by the evidence: what ABC stated on the air was that "the Chief Judge [*sic*] of L.A. Superior Court [Harry Peetris] actually tried to kill this series of reports. He even wrote the president of ABC, but that didn't work,

---

[3] The statement in question came at the beginning of the October 26, 1983, segment of the series, when the reporter states that "some people are watching this stuff, this series, just to find out who the bad guys are. Those folks might be bored with tonight's segment. Tonight we're going to look at some of the judges that lawyers think are outstanding. This includes some of the luminaries, the stars of L.A.'s court system." Appellant's name was not mentioned in this segment of the series.

obviously. . . ." Moments later, the program reiterated that "The presiding judge of L.A. Superior Court actually wrote a letter to the President of ABC, urging him to cancel this series of reports." The news video then showed Judge Peetris objecting to the broadcast and recommending that it be cancelled, and it referred to him as "the judge who tried to kill the survey." Plainly, this was not a false statement about appellant. Rather, it appears to be a statement, evidently true, about Judge Peetris.

e. *There is no triable issue regarding appellant's refusal to submit to an interview.*

The record reveals that ABC's news reporter, respondent Wayne Satz, telephoned appellant several times to request an interview. According to Satz, appellant refused to be interviewed unless he was given the opportunity to review the results of the poll in advance. Satz ultimately agreed to show the results to appellant one day before any videotaped interview, but appellant did not find this concession acceptable. Shortly before the report was to be aired, Satz renewed his request for an interview. Appellant responded with a letter stating ". . . I have no confidence in your objectivity and do not care to make any comments under circumstances where my presentation would be subject to your editing so as to dilute the content or pervert the meaning. However, should you be able to suggest some format whereby I could be secure in the knowledge that my position is fairly stated, I may be persuaded to appear. . . ." Unwilling to offer appellant the editorial control he wished to exercise, ABC reported in its broadcast that appellant had refused to submit to an interview or to allow a camera in his courtroom.

Appellant, in his deposition, confirmed that he had refused to give Satz an interview unless he was first afforded "adequate time to review the results" of the poll, and that Satz had offered to give him the results one day in advance of any interview. Appellant also testified that his "final statement" to Satz was that "I would not permit him to bring his camera in [the courtroom] and I would not submit to an interview for the reasons I had stated." In light of this evidence, there is no basis for concluding that ABC made a false statement of fact when it announced that appellant had refused to give an interview or allow a camera in his courtroom.

f. *There is no evidence of actual malice.*

The preceding paragraphs make clear that this court, like the trial court, does not perceive that any false statements of fact about appellant were made by ABC. ██ Assuming for the sake of argument that ABC's statements were false, appellant's lawsuit must still fail because he

did not produce clear and convincing evidence that respondents made their statements with actual malice.[4] And even though the repeated reference to appellant as the lowest scoring judge may have been unnecessarily heavy-handed, it did not constitute actual malice.

Appellant argues that malice is demonstrated by respondents' failure to conduct "a scientifically controlled evaluation of judicial performance." This argument is difficult to fathom. Unlike bacteria, judges cannot be placed in Petri dishes and examined under a microscope. Virtually every assessment of judicial performance—short of a purely numerical comparison of verdicts or sentences or of affirmance and reversal rates—must rely on the *subjective* opinions of observers. Such subjectivity inevitably bears with it the risk of bias, misperception and prejudice. Still, the risk that some of the 1,500 attorneys to whom ballots were sent harbored resentments against the judges being rated does not take the assessment endeavor outside the protection of the First Amendment. If we were to say that it does, we would in effect be endorsing the abolition of every opinion poll addressing the performance of politicians and candidates for public office. This prospect is one we cannot accept. Nothing in this record causes us to believe that those asked to rate a public official all lie about their familiarity with the official's performance or conspire to damage that official's career. Moreover, we trust that the viewers of any broadcast reporting the results of an opinion poll have enough intelligence to be aware of the limitations inherent in the poll and to draw their own conclusions as to the weight the poll should carry.

Appellant hints that respondents, bent on character assassination, concocted the results of their opinion poll. He quotes, "Professions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call." (*St. Amant* v. *Thompson* (1968) 390 U.S. 727, 732 [20 L.Ed.2d 262, 267-268, 88 S.Ct. 1323].) There is not a shred of evidence, much less clear and convincing evidence, to support this claim of fabrication.

---

[4] "Actual malice" is a term of art in the context of a defamation action. The concept of actual malice does not require us to question the publisher's motives because the term *cannot* be used in its common law sense of hatred, ill will, enmity, or a wanton desire to injure. (*Garrison* v. *Louisiana, supra,* 379 U.S. 64, 78-79 [13 L.Ed.2d 125, 135].) "Debate on public issues will not be uninhibited if the speaker must run the risk that it will be proved in court that he spoke out of hatred; even if he did speak out of hatred, utterances honestly believed contribute to the free interchange of ideas and the ascertainment of truth." (*Id.* at p. 73 [13 L.Ed.2d at p. 132].) Accordingly, appellant's allegation of facts which he believes show the respondents' bias and prejudice against him—facts relating to appellant's refusal to modify a sentence in one particular criminal case—are not germane to our determination of whether the statements in this case are constitutionally protected.

Nor is there any evidence suggesting that respondents doubted the veracity of the ballots that were returned: "[R]eckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice." (390 U.S. at p. 731 [20 L.Ed.2d at p. 267].) Appellant nonetheless contends that respondents "were placed on notice of the unreliability and untruthfulness of their statements," and therefore acted maliciously in publishing them. Even positing a worst-case scenario—that the 123 attorneys who rated appellant were unjustly plotting to discredit him—there is no evidence that ABC was aware or should have been aware of such a plot. If anything, the likelihood of a plot was diminished by sending ballots to prosecutors and criminal defense lawyers alike.

The case relied upon by appellant, *Goldwater* v. *Ginzburg* (2d Cir. 1969) 414 F.2d 324, is distinguishable. In that case, the defendants wanted to write a magazine article based on their premise that presidential candidate Barry Goldwater was "belligerent, suspicious, hot-tempered, and rigid because he has deep-seated doubts about his masculinity." (*Id.* at p. 329.) To accomplish this goal, the defendants sent a questionnaire to a list of psychiatrists, none of whom had treated Goldwater, asking them to evaluate Goldwater's mental state. Ultimately, the defendants selectively edited the psychiatrists' responses for use in their article, deleting comments favorable to Goldwater, and even rewriting the responses altogether, all so they could justify their predetermined conclusions about Goldwater. No similar conduct is present here. No evidence suggests that ABC had a preconceived plan to design a poll which would discredit appellant. The poll did not ask provocative questions about appellant; rather, it asked six rather innocuous questions about seventy-seven different judges. Appellant happened to be one of many judges included in the questionnaire. There is likewise no evidence that respondents, unlike Ginzburg in the *Goldwater* suit, altered the responses they received relating to appellant.

The trial court in this case correctly determined that ABC's broadcast statements about appellant were not defamatory as a matter of law.

### 3. *Causes of Action for Invasion of Privacy*

Appellant alleges two causes of action for invasion of privacy stemming from the videotape respondents took of him as he walked down a driveway to his car: first, he alleges that respondents placed him in a false light, and second that they intruded into his solitude.

### a. *False Light*

■ A "false light" cause of action is in substance equivalent to a libel claim, and should meet the same requirements of the libel claim, including proof of malice. (*Briscoe* v. *Reader's Digest Association, Inc.* (1971) 4 Cal.3d 529, 543 [93 Cal.Rptr. 866, 483 P.2d 34, 57 A.L.R.3d 1]; *Selleck* v. *Globe International, Inc.* (1985) 166 Cal.App.3d 1123, 1133 [212 Cal.Rptr. 838].) As already noted in our discussion of appellant's defamation claims, there is no evidence that ABC broadcast its statements for any reason other than those usually associated with newscasts. There is nothing here on which to base a finding of falsity or reckless disregard for the truth. Hence, there is no basis for a finding of malice.

■ There is, moreover, no basis for concluding that the videotape of appellant placed him in a false light.[5] Photographs are not actionable if they are fair and accurate depictions of the person and scene in question, even if they place the person in a less than flattering light, so long as the photographs do not surpass the limits of decency by being highly offensive to persons of ordinary sensibilities. (*Fellows* v. *National Enquirer, Inc.* (1986) 42 Cal.3d 234, 238 [228 Cal.Rptr. 215, 721 P.2d 97, 57 A.L.R.4th 223]; *Gill* v. *Hearst Publishing Co.* (1953) 40 Cal.2d 224, 230-231 [253 P.2d 441]; *Cantrell* v. *Forest City Publishing Co.* (1974) 419 U.S. 245, 253, fn. 5 [42 L.Ed.2d 419, 427, 95 S.Ct. 465]: published photographs depicting plaintiffs' abject poverty, old clothing and deteriorating home were undeniably correct, therefore no verdict could be entered against photographer.) Appellant does not deny that he is in fact the person shown walking to his car in the videotape, nor does he maintain that the photographs were indecent or offensive to a person of ordinary sensibility. He simply objects that the broadcasters chose to freeze the film at the moment he appeared to spot the videocamera, and he claims that he was thereby unfairly portrayed. His disappointment that a more flattering picture was not broadcast (or that none at all was broadcast) does not rise to the level of a compensable claim for invasion of privacy. The trial court was correct in granting summary judgment on this cause of action.

### b. *Intrusion into Solitude*

■ The right to be secure from intrusion is not absolute: " '[o]ne who intentionally intrudes, physically or otherwise, upon the solitude or seclu-

---

[5] The videotape not only does not falsely portray appellant, but it is also difficult to say that the videotape is unflattering to appellant in any manner. Appellant is shown walking briskly with briefcase in hand to his automobile. The environment, appellant's physical appearance and his demeanor are wholly respectable. To some viewers, the briefcase might well indicate that appellant is an industrious judge who takes work home with him.

sion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, *if the intrusion would be highly offensive to a reasonable person.'* " (*Miller* v. *National Broadcasting Co.* (1986) 187 Cal.App.3d 1463, 1482 [232 Cal.Rptr. 668, 69 A.L.R.4th 1027], quoting Rest.2d Torts, § 652B, italics by court.)

One factor relevant to whether an intrusion is "highly offensive to a reasonable person" is the extent to which the person whose privacy is at issue voluntarily entered into the public sphere. "[W]hen the legitimate public interest in the published information is substantial, a much greater intrusion into an individual's private life will be sanctioned, especially if the individual willingly entered into the public sphere. [¶] Because of their public responsibilities, government officials and candidates for such office have almost always been considered the paradigm case of 'public figures' who should be subjected to the most thorough scrutiny." (*Kapellas* v. *Kofman* (1969) 1 Cal.3d 20, 36-37 [81 Cal.Rptr. 360, 459 P.2d 912], fns. omitted.) Public officials and public figures are thus subject to news coverage, including being photographed, so long as the interference is no greater than that necessary to protect the overriding public interest. (*Galella* v. *Onassis* (2d Cir. 1973) 487 F.2d 986, 995 [28 A.L.R.Fed. 879].)

■ In this instance, there is no evidence to support a finding that ABC's method of newsgathering exceeded the public's interest in seeing a current videotape picture of an elected official. This is not a case in which ABC's news team entered appellant's home and bedroom uninvited to film a rescue attempt by paramedics. (See *Miller* v. *National Broadcasting Co., supra,* 187 Cal.App.3d 1463.) Nor is it a case in which respondents' camera crew came into physical contact with appellant, or endangered the safety of him or his family. (See *Galella* v. *Onassis, supra,* 487 F.2d at p. 994.) Nor is it even a case where the location of appellant's residence was disclosed.[6]

Respondents' camera crew averred that they videotaped appellant from their car, which was parked across the street from his home. They maintain that appellant was in full public view from the street at the time he was videotaped. Appellant claims he could not be seen from the photographer's location unless an enhanced lens was being used. He does not, however, claim that his car and the driveway where he was filmed were outside of

---

[6] We observe that judges might be unduly subject to harassment or physical danger if the location of their residences were readily available to disgruntled litigants. This peril is even greater where a judge has had substantial exposure in criminal cases involving violent felonies. Appellant has presided over such cases. The Legislature has recognized the need to protect the state's judges and has made information concerning judges' *home addresses* confidential . (See Gov. Code, § 6254.4 and Veh. Code, § 1808.4.) There is no evidence here, however, that the ABC news team went to appellant's residence in order to harass him or that the team sought to or in fact did make public the address of appellant's home.

public view. Nor has he shown that his home address or his car license plate number were disclosed. At most, the evidence shows that any invasion of privacy which took place was extremely de minimis because the camera crew did not physically encroach on appellant's property.

c. *No Actionable Invasion of Privacy Occurred*

In light of appellant's voluntary accession to a position of public trust, the social interest in allowing videotaped depictions of him, and the fact that appellant was photographed only while in public view, we conclude that there was no invasion of appellant's privacy as a matter of law.

DISPOSITION

The judgment is affirmed.

Lucas, P. J., and Ashby, J., concurred.