[No. B137678. Second Dist., Div. Five. Jan. 17, 2001.]

AZUCENA SANCHEZ-SCOTT, Plaintiff and Appellant, v.
ALZA PHARMACEUTICALS et al., Defendants and Respondents.

**COUNSEL**

Martin M. Berman and Steven W. Murray for Plaintiff and Appellant.

Arter & Hadden, Michael C. Zellers and Mollie F. Benedict for Defendants and Respondents.

**OPINION**

**TURNER, P. J.—**

## I. INTRODUCTION

Plaintiff, Azucena Sanchez-Scott, a breast cancer patient, appeals from a judgment dismissing her complaint after the trial court sustained without leave to amend a demurrer to her cause of action for common law invasion of privacy against defendants, Alza Pharmaceuticals, Alza Corporation, and Robert Martinez. Plaintiff's claims arise out of the presence of Mr. Martinez, a drug salesperson, during a breast and related examination of her by Dr.

Monty B. Polonsky, an oncologist. We reject defendants' arguments that the complaint fails to state causes of action for the tort of intrusion, which is based on a violation of her common law right to privacy. We therefore reverse the judgment of dismissal entered following the sustaining of defendants' demurrers as to the first cause of action.[1]

## II. BACKGROUND

### A. *The Complaint*

In reviewing the dismissal, all well-pleaded factual allegations must be assumed as true. (*Haggis v. City of Los Angeles* (2000) 22 Cal.4th 490, 495 [93 Cal.Rptr.2d 327, 993 P.2d 983]; *Aubry v. Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 966-967 [9 Cal.Rptr.2d 92, 831 P.2d 317].) The complaint alleged that Dr. Polonsky is a licensed physician and is the employee of Greene and Koehler, a medical partnership. Alza Pharmaceuticals and Alza Corporation (hereinafter referred to collectively as Alza) are companies in the business of selling medicines, drugs, and medical devices to physicians. Mr. Martinez is employed by Alza as a salesperson. Mr. Martinez's sales territory includes the County of Los Angeles and his customers included Dr. Polonsky and the Greene and Koehler partnership. The complaint contained causes of action against all defendants for invasion of privacy (first) and violation of article I, section 1 of the California Constitution (second). The complaint also contained a third cause of action against Dr. Polonsky and the Greene and Koehler partnership for lack of informed consent.

The complaint alleged that, prior to October 1998, Alza created and promoted a mentor program whereby its representatives, including Mr. Martinez, were directed to participate in private medical activities of Alza's customers who were health care providers. As part of this program, Mr. Martinez was directed to participate in such a program in connection with plaintiff's medical treatment. Prior to June 1997, plaintiff had been diagnosed as having breast cancer. Dr. Polonsky became her treating oncologist.

---

[1] Defendants specifically demurred on the ground that plaintiff's second cause of action for a violation of her constitutional right of privacy premised on article I, section 1 of the California Constitution failed to state sufficient facts. (See *Loder v. City of Glendale* (1997) 14 Cal.4th 846, 887 [59 Cal.Rptr.2d 696, 927 P.2d 1200]; *Hill v. National Collegiate Athletic Assn.* (1994) 7 Cal.4th 1, 39-49 [26 Cal.Rptr.2d 834, 865 P.2d 633].) In the demurrer opposition, plaintiff made no effort to argue the merits of her state constitutional claim. On appeal, plaintiff failed to raise any contention in the opening and reply briefs as to the second cause of action based on the constitutional privacy claim. Hence, any issue concerning the second cause of action has been waived. (*Tiernan v. Trustees of Cal. State University & Colleges* (1982) 33 Cal.3d 211, 216, fn. 4 [188 Cal.Rptr. 115, 655 P.2d 317]; *Johnston v. Board of Supervisors* (1947) 31 Cal.2d 66, 70 [187 P.2d 686], disapproved on another point in *Bailey v. County of Los Angeles* (1956) 46 Cal.2d 132, 139 [293 P.2d 449].)

Her breast cancer was treated with chemotherapy under Dr. Polonsky's direction, control, and supervision.

On October 7, 1998, plaintiff went to the offices of the Greene and Koehler partnership, for an appointment with Dr. Polonsky. She was taken into a private examining room. At the time, she was wearing a skirt and blouse. Dr. Polonsky entered the room with an unidentified man, who appeared to be a professional. Dr. Polonsky introduced the man, who was ultimately identified as Mr. Martinez, to her. The complaint alleges that Mr. Martinez was introduced as "a person . . . who was looking at Dr. Polonsky's work." During the examination, plaintiff began to feel extremely hot and flushed. She carried a pocket fan with her for such occasions. She took the fan out of her purse and began to fan herself to feel cooler. At this point, Dr. Polonsky took the fan from plaintiff and gave it to Mr. Martinez. Mr. Martinez was told, "[I]t would give him something to do." Mr. Martinez began fanning plaintiff, who became extremely uncomfortable because Dr. Polonsky and Mr. Martinez both started to laugh. Plaintiff told Mr. Martinez that she would fan herself. But Mr. Martinez refused her request and continued to fan her.

With Mr. Martinez still in the examination room, Dr. Polonsky then instructed plaintiff to get up on the examining table. Dr. Polonsky told her that he needed to examine her underarms. Plaintiff unbuttoned her blouse, which was too tight for Dr. Polonsky to put his hands inside to conduct the examination. In Mr. Martinez's presence, Dr. Polonsky told plaintiff to take off her bra. This was because Dr. Polonsky needed to examine her breasts. Dr. Polonsky also instructed her to lie down on her back, with her knees up, and to pull down the waistband of her skirt so that he could also examine her abdomen. Plaintiff remained nude from the abdomen up. While all of this occurred, Mr. Martinez was in the examination room, sitting beside the examining table. Mr. Martinez watched Dr. Polonsky examine plaintiff's breasts. As the examination continued in Mr. Martinez's presence, plaintiff continued to become more uncomfortable. As soon as the examination was concluded, plaintiff got up and tried to cover herself because she was embarrassed and uncomfortable. Dr. Polonsky told her she needed a mammogram and chest X-rays. Thereupon, Dr. Polonsky and Mr. Martinez left the examination room.

Plaintiff dressed and asked a receptionist who Mr. Martinez was. The receptionist responded that Mr. Martinez was a "drug salesman." Plaintiff related what had happened in the examination room to the receptionist. Plaintiff explained she had undressed in front of Mr. Martinez. The receptionist indicated, "[T]hat wasn't right." After she left the office, plaintiff

began to cry from shame and anger. When she returned to her office, plaintiff called Dr. Polonsky and asked who the man had been in the room during her examination. Dr. Polonsky apologized for not explaining who Mr. Martinez was. Plaintiff told Dr. Polonsky that he had violated the trust that she placed in him. The next day, plaintiff telephoned the doctor's office and asked the receptionist for Mr. Martinez's name. The receptionist transferred the call to Dr. Polonsky, who apologized again and gave her the information she requested.

A letter attached to the complaint, prepared by Alza's corporate counsel, explained why Mr. Martinez was present in Dr. Polonsky's office. The letter stated: "Mr. Martinez was at Dr. Polonsky's office on the date in question because he was participating in an oncology mentorship program. A mentorship program is a well-established and accepted method of providing training to therapeutic sales specialists. This program involves the ALZA specialist spending the day with an oncologist to better learn how an oncologist attends to patients, manages medications, and generally oversees administrative functions of the office." The letter further indicated: a "therapeutic sales specialist" does not treat patients; the physician decides whether to allow the drug salesperson to be present during an examination; it was common for the physician to explain the "oncology mentorship program" to the patient at the beginning of the office visit; and Mr. Martinez recalled that this explanation was given to plaintiff before the examination.

### B. *The General Demurrer*

Defendants, Alza and Mr. Martinez, filed a general demurrer to plaintiff's common law privacy claim on the ground that there were insufficient facts to constitute a cause of action against them. They argued that, as a matter of law, the causes of action for invasion of privacy did not meet the standard of intrusion that is highly offensive to a reasonable person. Defendants further argued that there was no intrusion on plaintiff's seclusion because she had no reasonable expectation of privacy given that she knew of Mr. Martinez's presence. Defendants argued there was no emergency and plaintiff could reasonably have objected to Mr. Martinez's presence in the room. Finally, defendants asserted the trial court should make the determination that no reasonable person would have found Mr. Martinez' presence to be highly offensive and that this was nothing more than "a situation which she found socially uncomfortable." Plaintiff opposed the demurrers on the ground that the allegations in the complaint established the tort of intrusion as articulated in *Sanders v. American Broadcasting Companies* (1999) 20 Cal.4th 907, 911, 914-915 [85 Cal.Rptr.2d 909, 978 P.2d 67]; *Shulman v. Group W. Productions, Inc.* (1998) 18 Cal.4th 200, 214, 227-228, 231 [74 Cal.Rptr.2d 843,

955 P.2d 469] (lead opn. of Werdergar, J.); *Hill v. National Collegiate Athletic Assn., supra,* 7 Cal.4th at pages 18, 24, 26; *Miller v. National Broadcasting Co.* (1986) 187 Cal.App.3d 1463, 1481-1487 [232 Cal.Rptr. 668, 69 A.L.R.4th 1027]; and *De May v. Roberts* (1881) 46 Mich. 160 [9 N.W. 146, 147-149].

The trial court sustained the demurrers to the common law invasion of privacy causes of action without leave to amend. The judgment dismissing the complaint as to Alza and Mr. Martinez was entered on October 29, 1999. This timely appeal followed.

## III. DISCUSSION

### A. *Standard of Review*

An appellate court's " 'only task in reviewing a ruling on a demurrer is to determine whether the complaint states a cause of action.' " (*People ex rel. Lungren v. Superior Court* (1996) 14 Cal.4th 294, 300 [58 Cal.Rptr.2d 855, 926 P.2d 1042]; *Moore v. Regents of University of California* (1990) 51 Cal.3d 120, 125 [271 Cal.Rptr. 146, 793 P.2d 479].) The reviewing court assumes the truth of allegations in the complaint which have been properly pleaded and gives it a reasonable interpretation by reading it as a whole and with all its parts in their context. (*Stop Youth Addiction, Inc. v. Lucky Stores, Inc.* (1998) 17 Cal.4th 553, 558 [71 Cal.Rptr.2d 731, 950 P.2d 1086]; *People ex rel. Lungren v. Superior Court, supra,* 14 Cal.4th at pp. 300-301; *Aubry v. Tri-City Hospital Dist., supra,* 2 Cal.4th at pp. 966-967.) However, the assumption of truth does not apply to contentions, deductions, or conclusions of law and fact. (*Moore v. Regents of University of California supra,* 51 Cal.3d at p. 125.) Furthermore, any allegations that are contrary to the law or to a fact of which judicial notice may be taken will be treated as a nullity. (*Interinsurance Exchange v. Narula* (1995) 33 Cal.App.4th 1140, 1143 [39 Cal.Rptr.2d 752]; *Fundin v. Chicago Pneumatic Tool Co.* (1984) 152 Cal.App.3d 951, 955-956 [199 Cal.Rptr. 789].) The Supreme Court has held: "On appeal from a judgment of dismissal entered after a demurrer has been sustained without leave to amend, unless failure to grant leave to amend was an abuse of discretion, the appellate court must affirm the judgment if it is correct on any theory. [Citations.] If there is a reasonable possibility that the defect in a complaint can be cured by amendment, it is an abuse of discretion to sustain a demurrer without leave to amend. [Citation.] The burden is on the plaintiff, however, to demonstrate the manner in which the complaint might be amended. [Citation.]" (*Hendy v. Losse* (1991) 54 Cal.3d 723, 742 [1 Cal.Rptr.2d 543, 819 P.2d 1]; *Goodman v. Kennedy* (1979) 18 Cal.3d 335, 349 [134 Cal.Rptr. 375, 556 P.2d 737].) For the reasons stated

below, we conclude the demurrer of Alza and Mr. Martinez to the first cause of action for common law invasion of privacy should not have been sustained.

### B. *The Demurrer Should Have Been Overruled*

■ The first cause of action alleged defendants were civilly liable for the tort of intrusion, which is based on a violation of plaintiff's common law privacy rights. California has recognized the four types of common law claims for invasion of privacy which are identified in the Restatement Second of Torts, section 652A: "(a) unreasonable intrusion upon the seclusion of another, as stated in § 652B; or [¶] (b) appropriation of the other's name or likeness, as stated in § 652C; or [¶] (c) unreasonable publicity given to the other's private life, as stated in § 652D; or [¶] (d) publicity that unreasonably places the other in a false light before the public, as stated in § 652E." (See *Sanders v. American Broadcasting Companies, supra,* 20 Cal.4th at p. 914; *Shulman v. Group W Productions, Inc., supra,* 18 Cal.4th at pp. 230-231 (lead opn. of Werdegar, J.); *Hill v. National Collegiate Athletic Assn., supra,* 7 Cal.4th at pp. 23-27.)

■ The California Supreme Court has adopted the definition of the tort of intrusion as set forth in *Miller v. National Broadcasting Co., supra,* 187 Cal.App.3d at page 1482, and in the Restatement Second of Torts section 652B. (See *Sanders v. American Broadcasting Companies, supra,* 20 Cal.4th at pp. 914-915; *Shulman v. Group W Productions, Inc., supra,* 18 Cal.4th at p. 231.) Section 652B of the Restatement Second of Torts describes the intrusion tort as follows: "One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person." (See *Wilkins v. National Broadcasting Co.* (1999) 71 Cal.App.4th 1066, 1075-1076 [84 Cal.Rptr.2d 329]; *Fibreboard Corp. v. Hartford Accident & Indemnity Co.* (1993) 16 Cal.App.4th 492, 514 [20 Cal.Rptr.2d 376].) The definition of the intrusion tort consists of two elements: "(1) the intrusion into a private place, conversation or matter, (2) in a manner highly offensive to a reasonable person." (*Sanders v. American Broadcasting Companies, supra,* 20 Cal.4th at pp. 914-915; accord, *Shulman v. Group W Productions, Inc., supra,* 18 Cal.4th at p. 231.) The Supreme Court has defined the first element as follows: "[T]he plaintiff must show that the defendant penetrated some zone of physical or sensory privacy surrounding, or obtained unwanted access to data about, the plaintiff. The tort is proven only if the plaintiff had an objectively reasonable expectation of seclusion or solitude in the place, conversation or data source. [Citations.]" (*Shulman v. Group W Productions, Inc., supra,* 18 Cal.4th at pp. 231-232; accord, *Sanders v. American Broadcasting Companies, supra,* 20 Cal.4th at pp. 914-915.) Whether a legally

recognized privacy interest exists is a question of law to be decided by the court. (*Hill v. National Collegiate Athletic Assn., supra*, 7 Cal.4th at p. 40; *Feminist Women's Health Center v. Superior Court* (1997) 52 Cal.App.4th 1234, 1245 [61 Cal.Rptr.2d 187].) The issue of whether there is a reasonable expectation of privacy under the circumstances is a mixed question of law and fact. (*Hill v. National Collegiate Athletic Assn., supra*, 7 Cal.4th at p. 40; *Feminist Women's Health Center v. Superior Court, supra*, 52 Cal.App.4th at p. 1246.)

In *Shulman v. Group W. Productions, Inc., supra*, 18 Cal.4th at pages 230-231, the lead opinion explained the intrusion tort as follows: "Of the four privacy torts . . . , the tort of intrusion into private places, conversations or matter is perhaps the one that best captures the common understanding of an 'invasion of privacy.' It encompasses unconsented-to physical intrusion into the home, hospital room or other place the privacy of which is legally recognized, . . . [Citation.] It is in the intrusion cases that invasion of privacy is most clearly seen as an affront to individual dignity. '[A] measure of personal isolation and personal control over the conditions of its abandonment is of the very essence of personal freedom and dignity, is part of what our culture means by these concepts. A man whose home may be entered at the will of another, whose conversations may be overheard at the will of another, whose marital and familial intimacies may be overseen at the will of another, is less of a man, has less human dignity, on that account. He who may intrude upon another at will is the master of the other and, in fact, intrusion is a primary weapon of the tyrant.' [Citation.]" (*Ibid.*)

 In this case, the first element of intrusion into a private place, conversation, or matter concerns whether the medical examination room was protected from intruders. Under California law, the protection under the tort of invasion of privacy covers "spheres" where an ordinary person in plaintiff's position could reasonably expect that the particular defendant should be excluded. (*Sanders v. American Broadcasting Companies, supra*, 20 Cal.4th at p. 916; *Wilkins v. National Broadcasting Co., supra*, 71 Cal.App.4th at p. 1076; *Dietemann v. Time, Inc.* (9th Cir. 1971) 449 F.2d 245, 249.) As the California Supreme Court stated in *Sanders v. American Broadcasting Companies, supra*, 20 Cal.4th at pages 915-916: "[P]rivacy, for purposes of the intrusion tort, is not a binary, all-or-nothing characteristic. There are degrees and nuances to societal recognition of our expectations of privacy: the fact that the privacy one expects in a given setting is not complete or absolute does not render the expectation unreasonable as a matter of law. Although the intrusion tort is often defined in terms of 'seclusion' [citations], the seclusion referred to need not be absolute. 'Like "privacy," the concept of "seclusion" is relative. The mere fact that a person can be seen by someone does not automatically mean that he or she can be

legally forced to be subject to being seen by everyone.' [Citations.]" In order for an expectation to be reasonable in the intrusion context, it is not necessary that there be absolute or complete privacy. (*Id.* at pp. 915-923 [employee who had no reasonable expectations of privacy because of presence of coworkers may have an intrusion cause of action premised on covert videotaping].)

In that respect, this case is very much like the 1881 seminal case of *De May v. Roberts, supra,* 9 N.W. at pages 147-149, which first recognized a tortious invasion of privacy. *De May* involved a third party intrusion into a patient's home at the request of the physician. This occurred, without objection, because the patient believed that the intruder had medical training. *De May* has been relied on by several California courts, including the Supreme Court, in analyzing propositions concerning the intrusion tort. (See *Sanders v. American Broadcasting Companies, supra,* 20 Cal.4th at p. 917; *Miller v. National Broadcasting Co, supra,* 187 Cal.App.3d at p. 1483; *People v. Brown* (1979) 88 Cal.App.3d 283, 291, fn. 5 [151 Cal.Rptr. 749].)

In *De May*, a physician took a nonprofessional male, identified by name in the opinion only as a Mr. Scattergood, to a patient's home to assist in the delivery of a baby. The physician introduced the gentleman, identified only as Mr. Scattergood, to the patient's husband as "a friend." The *De May* opinion describes these events as follows: "[The doctor] said to him, 'that I had fetched a friend along to help carry my things . . . .'" (*De May v. Roberts, supra,* 9 N.W. at p. 147.) Mr. Scattergood had no knowledge about the practice of medicine. However, Mr. Scattergood was allowed to assist in the delivery by taking the patient's hand and holding her during a "paroxysm of pain." The Michigan Supreme Court concluded that both the physician and Mr. Scattergood were liable for the intrusion. *De May* held that the patient had the right to presume that a practicing physician would not take a person who is not connected with the medical profession to assist in a childbirth. (*Ibid.*) *De May* stated: "We are of opinion that the plaintiff and her husband had a right to presume that a practicing physician would not, upon an occasion of that character, take with him and introduce into the house, a young man in no way, either by education or otherwise, connected with the medical profession; and that something more clear and certain as to his non-professional character would be required to put the plaintiff and her husband upon their guard, or remove such presumption, than the remark made by [the physician] that he had brought a friend along to help carry his things. The plaintiff was not bound however . . . strong it might be considered, but had a right to prove what she supposed was the fact, and this she could do by showing anything said at the time having such a tendency, or in the absence thereof what she actually believed to be the fact." (*Ibid.*)

*De May* further concluded that the patient was not precluded from recovering damages because she and her husband consented to the third party's

presence under the mistaken assumption that he was a physician. *De May* stated: "[The physician] therefore took an unprofessional young unmarried man with him, introduced and permitted him to remain in the house of the plaintiff, when it was apparent that he could hear at least, if not see all that was said and done, and as the jury might have found, under the instructions given, without either the plaintiff or her husband having any knowledge or reason to believe the true character of such third party. It would be shocking to our sense of right, justice and propriety to doubt even but that for such an act the law would afford an ample remedy. To the plaintiff the occasion was a most sacred one and no one had the right to intrude unless invited or because of some real and pressing necessity which it is not pretended existed in this case. The plaintiff had a legal right to the privacy of her apartment at such a time, and the law secures to her this right by requiring others to observe it, and to abstain from its violation. The fact that at the time, she consented to the presence of [Mr.] Scattergood supposing him to be a physician, does not preclude her from maintaining an action and recovering substantial damages upon afterward ascertaining his true character. In obtaining admission at such a time and under such circumstances without fully disclosing his true character, both parties were guilty of deceit, and the wrong does thus done entitles the injured party to recover the damages afterwards sustained, from shame and mortification upon discovering the true character of the defendant. . . ." (*De May v. Roberts, supra,* 9 N.W. at pp. 148-149.)

It cannot be easily disputed that medical examinations involve private matters. Indeed, with respect to conversations that occur between a physician and patient, our colleague Associate Justice Patti S. Kitching, quoting the lead opinion in *Shulman v. Group W Productions, Inc., supra,* 18 Cal.4th at page 239, wrote: " '[a] patient's conversation with a provider of medical care in the course of treatment, including emergency treatment, carries a traditional and legally well-established expectation of privacy.' [Citation.]" (*Wilkins v. National Broadcasting Co., supra,* 71 Cal.App.4th at p. 1078.)

Similarly, with respect to a hospital room, the Court of Appeal in *People v. Brown, supra,* 88 Cal.App.3d at pages 291-293, explained the expectations of privacy a patient in a hospital room under the Fourth Amendment of the United States Constitution, by comparing it to the tort of intrusion. *Brown* concluded that no Fourth Amendment violation occurred when shoes caked with blood were discovered in the defendant's hospital room; the defendant did not object to a visit by law enforcement officers; and defendant permitted the officers to enter after the nurse explained they were there to see the accused. (*Ibid.*) *Brown* stated: "Moreover, the question of privacy in a hospital does not merely turn on a general expectation of privacy in use of a given space, but to some degree depends on the person whose conduct is

questioned. Clearly, although by checking himself [or herself] into a hospital, a patient may well waive his right of privacy as to hospital personnel, it is obvious that he has not turned 'his' [or her] room into a public thoroughfare. Indeed, the classic example of tortious invasions of privacy involves a hospital room. [¶] . . . The patient knows and expects that nurses, doctors, food handlers, and others enter and leave 'his' [or her] hospital room in accordance with the medical needs of the patient and the hospital routine. On the other hand, a hospital room is clearly not a public hall which anyone in the building is free to use as needed. Thus, at least for certain purposes, a hospital room is fully under the control of the medical staff; yet for other purposes it is 'the patient's room. . . .' " (*Id.* at pp. 290-291, fn. omitted.)

Defendants do not cite to any authority which permits a male drug salesperson to be present in an examination room during the examination of a partially disrobed woman. A breast cancer patient who goes into an oncologist's office to be examined does not, nor should she, take a risk that what goes on in the examination room will be seen or heard by anyone other than medical personnel. She does not take a risk that a drug salesperson will be a part of the process during which her breasts will be examined. Therefore, the mere presence of Mr. Martinez, a drug salesman, in the examination room could be deemed by a trier of fact to be both a physical and sensory intrusion into plaintiff's seclusion. Under such circumstances, we conclude that jurors could conclude a breast cancer patient such as plaintiff had an objectively reasonable expectation of privacy in the medical examination room of her oncologist. No decisional authority supports a contrary conclusion.

Defendants argue though their conduct was not "highly offensive," as a matter of law. ▆▆ There is a preliminary determination of "offensiveness" which must be made by the court in discerning the existence of a cause of action for intrusion. (*Wilkins v. National Broadcasting Co., supra*, 71 Cal.App.4th at pp. 1075-1076; *Miller v. National Broadcasting Co., supra*, 187 Cal.App.3d at pp. 1483-1484.) ▆▆ Defendants argue their conduct was not highly offensive because plaintiff consented to Mr. Martinez's presence in the examination room. However, the complaint alleges that Mr. Martinez's status as a drug salesperson was never related to plaintiff. ▆▆ The maxim of law that one "who consents to an act is not wronged by it" applies to the tort of invasion of privacy. (*Hill v. National Collegiate Athletic Assn., supra*, 7 Cal.4th at p. 26; Civ. Code, § 3515.) In *Hill*, the Supreme Court stated: "[T]he plaintiff in an invasion of privacy case must have conducted himself or herself in a manner consistent with an actual expectation of privacy, i.e., he or she must not have manifested by his or her conduct a voluntary consent to the invasive actions of defendant. If voluntary consent is present, a defendant's conduct will rarely be deemed 'highly

offensive to a reasonable person' so as to justify tort liability. [Citations.]" (*Hill v. National Collegiate Athletic Assn., supra,* 7 Cal.4th at p. 26.) However, in determining whether offensiveness exists, a court must consider a variety of circumstances of the intrusion. (*Ibid.; Miller v. National Broadcasting Co., supra,* 187 Cal.App.3d at pp. 1483-1484; accord, *Shulman v. Group W Productions, Inc., supra,* 18 Cal.4th at p. 236.) The factors include: (1) the degree of intrusion; (2) the context, conduct and circumstances surrounding the intrusion; (3) the intruder's motives and objectives; (4) the setting into which the intrusion occurs; and (5) the expectations of those whose privacy is invaded. (*Hill v. National Collegiate Athletic Assn., supra,* 7 Cal.4th at p. 26; *Miller v. National Broadcasting Co., supra,* 187 Cal.App.3d at pp. 1483-1484; accord, *Shulman v. Group W Productions, Inc., supra,* 18 Cal.4th at pp. 236-237.)

Defendants contend that what transpired in the examination room was not highly offensive. Defendants argue as follows: "Martinez is a professional therapeutic sales specialist whose objective was to observe Dr. Polonsky's treatment of patients, including Plaintiff, as part of an established mentoring program. Martinez was introduced to Plaintiff by her physician, Dr. Polonsky, at the onset of the examination as someone observing his work. Plaintiff did not object to Martinez' presence or inquire further until after the examination was completed. Given these circumstances, the court properly concluded that Martinez' known presence could not be highly offensive to a reasonable person."

The problem, though, with this argument is that it does not take into account all of the pertinent circumstances. The complaint makes it clear that plaintiff, a cancer patient, never consented to having an examination of her breasts observed by a male drug salesperson. At no time did Dr. Polonsky explain Mr. Martinez's true identity. Further, Mr. Martinez never explained his true identity. Additionally, plaintiff used a pocket fan to cool herself. When plaintiff began to use the fan in order to cool herself, it was taken from her by Dr. Polonsky and handed to Mr. Martinez. Mr. Martinez was told that this would give him something to do. Mr. Martinez began fanning plaintiff. Mr. Martinez and Dr. Polonsky then began to laugh. Plaintiff asked if she could fan herself; but Mr. Martinez refuse to hand the pocket fan back to her. Thereafter, plaintiff was required to disrobe from the abdomen up and was observed by Mr. Martinez during the breast examination. Later, Dr. Polonsky's receptionist indicated that this conduct "wasn't right." Further, Dr. Polonsky admitted he had not explained who Mr. Martinez was and twice apologized to plaintiff. When the totality of the circumstances of the intrusion is examined, not merely the selected facts identified by defendants, we conclude that the complaint alleges highly offensive conduct involving a

cancer patient whose breasts were observed by a drug salesperson, whose occupation was never disclosed, during an examination inside the confines of a physician's office. It bears emphasis that there are specific allegations that plaintiff was never advised as to Mr. Martinez's role, other than that he was present to watch.

Further, the present case is different from the scenarios where courts have found consent so as to avoid a privacy violation. The examples described in *Hill v. National Collegiate Athletic Assn.*, *supra*, 7 Cal.4th at page 26, while the Supreme Court was describing the highly offensive element of the tort of intrusion, are as follows: "(Rest.2d Torts, § 652B, com. c [no liability for public observation of plaintiff 'since he is not then in seclusion, and his appearance is public and open to the public eye']; *Gill* v. *Hearst Publishing Co.* (1953) 40 Cal.2d 224, 230 [253 P.2d 441] [plaintiffs waived any right to privacy by a 'pose voluntarily assumed in a public market place']; *Aisenson* v. *American Broadcasting Co.* (1990) 220 Cal.App.3d 146, 162 [269 Cal.Rptr. 379] ['One factor relevant to whether an intrusion is "highly offensive to a reasonable person" is the extent to which the person whose privacy is at issue voluntarily entered into the public sphere.']; *Melvin* v. *Reid* (1931) 112 Cal.App. 285, 290 [297 P. 91] [no right to privacy in matters publicized with consent: 'There can be no privacy in that which is already public.'] . . ." Later in *Hill*, the court discussed the diminished expectation of privacy of collegiate athletes as follows: "By its nature, participation in intercollegiate athletics, particularly in highly competitive postseason championship events, involves close regulation and scrutiny of the physical fitness and bodily condition of student athletes. Required physical examinations (including urinalysis), and special regulation of sleep habits, diet, fitness, and other activities that intrude significantly on privacy interests are routine aspects of a college athlete's life not shared by other students or the population at large. Athletes frequently disrobe in the presence of one another and their athletic mentors and assistants in locker room settings where private bodily parts are readily observable by others of the same sex. They also exchange information about their physical condition and medical treatment with coaches, trainers, and others who have a 'need to know.' [¶] As a result of its unique set of demands, athletic participation carries with it social norms that effectively diminish the athlete's reasonable expectation of personal privacy in his or her bodily condition, both internal and external. In recognition of this practical reality, drug testing programs involving athletic competition have routinely survived Fourth Amendment 'privacy' challenges. Drug testing has become a highly visible, pervasive, and well-accepted part of athletic competition, particularly on intercollegiate and professional levels. [Citation.] It is a reasonably expected part of the life of an athlete, especially one engaged in advanced levels of competition,

where the stakes and corresponding temptations are high. [¶] The student athlete's reasonable expectation of privacy is further diminished by two elements of the NCAA's drug testing program—advance notice and the opportunity to consent to testing. . . ." (*Hill v. National Collegiate Athletic Assn., supra,* 7 Cal.4th at pp. 41-42, fn. omitted.) Although in this latter quotation from *Hill* the issue involved the general issue of consent, rather than specifically the element of highly offensive conduct, the factors in the present case differ substantially from those where consensual activity has been found so as to forestall a common law privacy claim.

We also disagree with defendants that they may escape liability because they owed no duty to plaintiff. As stated above, the tort of intrusion involves two elements: "(1) the intrusion into a private place, conversation or matter, (2) in a manner highly offensive to a reasonable person. [Citation.]" (*Sanders v. American Broadcasting Companies, supra,* 20 Cal.4th at p. 914; *Miller v. National Broadcasting Co., supra,* 187 Cal.App.3d at p. 1482.) Mr. Martinez allegedly intruded into a medical examination room in a highly offensive manner as part of his company's mentor program. The allegations for invasion of privacy against Mr. Martinez and for agency against his employer were sufficient to state a cause of action and to withstand a demurrer. (*Skopp v. Weaver* (1976) 16 Cal.3d 432, 437 [128 Cal.Rptr. 19, 546 P.2d 307]; *Noble v. Sears, Roebuck & Co.* (1973) 33 Cal.App.3d 654, 663 [109 Cal.Rptr. 269, 73 A.L.R.3d 1164].)

## IV. DISPOSITION

The judgment of dismissal and the order sustaining the demurrer to the first cause of action are reversed. The judgment of dismissal and order sustaining the demurrer to the second cause of action is affirmed. Plaintiff, Azucena Sanchez-Scott, is to recover her costs on appeal from defendants, Alza Pharmaceuticals, Alza Corporation, and Robert Martinez.

Grignon, J., and Godoy Perez, J., concurred.

On January 29, 2001, the opinion was modified to read as printed above.