Filed 7/1/21

# CERTIFIED FOR PUBLICATION

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| SANDRA MEZGER et al., | B305745 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BC714748) |
| v. | |
| RANDY RALPH BICK, JR., et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Holly J. Fujie, Judge. Affirmed.

Glaser Weil Fink Howard Avchen & Shapiro, Craig H. Marcus and Cynthia E. Organ for Plaintiffs and Appellants.

Lewis Brisbois Bisgaard & Smith, Jeffry A. Miller, Wendy S. Dowse, Dana S. Fox and Michael S. Moss for Defendants and Respondents.

\* \* \* \* \* \* \* \* \* \*

This is a dispute between neighbors. Plaintiffs Sandra and Jeffrey Mezger allege their neighbors, comedian Kathleen Griffin and her boyfriend Randy Ralph Bick, Jr., invaded their right to privacy by recording images of the plaintiffs' backyard and audio of their private conversations with their iPhones and Nest security cameras. Defendants moved for summary adjudication of plaintiffs' privacy claims. The trial court concluded that any privacy intrusion was insubstantial and granted summary adjudication in defendants' favor. We affirm.

**BACKGROUND**

Plaintiffs sued defendants in July 2018, alleging causes of action for nuisance, violation of Penal Code section 632, invasion of the common law right of privacy, invasion of the California constitutional right of privacy, invasion of privacy, false light, and nuisance in violation of the municipal code. Plaintiffs alleged defendants moved next door in July 2016 and immediately began making noise complaints about plaintiffs to their homeowners association (HOA) and to the Los Angeles Police Department.

Plaintiffs alleged defendants initially made iPhone video recordings of their backyard, and later installed a Nest "audio-video surveillance system, point[ed] . . . directly into [plaintiffs'] back yard in order to spy on and record them." Plaintiffs alleged the goal of the camera system was to gather evidence so defendants could make further complaints to the HOA.

Plaintiffs first learned of the recordings in September 2017, after police came to their home in response to a noise complaint and told plaintiffs defendants had recorded them. A few days later, defendants released one of the recordings to the Huffington Post. The recording included an expletive-laden rant by Mr. Mezger, who was apparently angry after defendants called

2

police complaining about a backyard pool party for his grandchildren. Recordings from other occasions were given to other media outlets. Ms. Griffin also used some of the recordings during her stage performances.

Plaintiffs alleged the recordings also captured private conversations occurring *within* their home, based on the position of one of the cameras. Plaintiffs alleged the recording was constant and continuous, and prevented them from using their backyard or opening their windows.

Plaintiffs alleged there was no legitimate security interest in operating the surveillance system because the parties live in a gated community with guarded access and constant patrols. And, given the timing of the installation of the camera (immediately after the HOA found plaintiffs had not violated any rules), plaintiffs believed the true purpose of the system was to spy on plaintiffs.

Ms. Griffin moved for summary adjudication of the causes of action for violation of Penal Code section 632, common law invasion of privacy, and constitutional invasion of privacy, and Mr. Bick joined Ms. Griffin's motion, with his own separate statement and compendium of evidence (which was nearly identical to that submitted by Ms. Griffin).

In support of the motion, Ms. Griffin testified she is a public figure, and has received death threats and been stalked in the past. To ensure her personal safety, she had a Nest security system installed on her property. The security system is entirely on her own property. The cameras were "positioned in such a way . . . to maximize [her] security." "To the extent that any of [her] security cameras ever detected any portion of the Mezger property, that was an unintended, collateral consequence due to

3

the maximization of the security system, given the topography of [her] property."

Ms. Griffin's second floor bedroom is accessible by a staircase from her backyard. To capture the entire staircase and the balcony outside her bedroom, the camera incidentally captured a portion of plaintiffs' yard. A screenshot from the camera outside Ms. Griffin's second story bedroom shows the camera's vantage point. The screenshot consists mostly of the balcony outside Ms. Griffin's bedroom and the stairs leading from the balcony to the backyard. A portion of plaintiffs' backyard, including their pool, can be seen in the screenshot.

According to Ms. Griffin, the Mezgers have frequently hosted loud parties and events at their home, causing Ms. Griffin to make noise complaints to the HOA and the police. She made brief videos on her phone to substantiate her noise complaints. She was on her property at all times while making the videos. Mr. Bick also testified that he "never placed any part of [his] body, or any recording device (including [his] iPhone and the Nest), over the Mezgers' property line." Any recorded sounds "were so loud that they emanated onto Kathy's property from the Mezgers' property."

According to Ms. Griffin, she never knowingly recorded any conversations or activities occurring within plaintiffs' home. The camera plaintiffs claim is near one of their windows is a nonoperational camera installed by the previous owners.

In their discovery responses, plaintiffs admitted that Ms. Griffin had a right to install cameras on her property, and that they had security cameras at their properties in Arizona and Goleta, California.

4

In opposition to defendants' motion, plaintiffs submitted evidence the security cameras were installed nine months after defendants had moved into the home, on the same day the HOA determined there was no merit to the noise complaints lodged by defendants. The HOA had told Mr. Bick he and Ms. Griffin needed to "document" plaintiffs' conduct to substantiate their claims, and defendants admitted the security system was installed to document the extent of the noise disturbances affecting their property. Ms. Griffin instructed her personal assistant to review the recordings daily for audio of plaintiffs.

Plaintiffs' and defendants' properties were separated by a six-foot tall concrete wall, with two feet of wrought iron on top. Defendants' second floor balcony was visible from some parts of plaintiffs' backyard, and defendants had a view of plaintiffs' backyard from their balcony. Defendants' balcony was approximately 60 feet away from plaintiffs' house.

Plaintiffs testified the recordings were made without their knowledge or consent. They "expected that [their] communications and activities on [their] own property would not be recorded." Plaintiffs first became aware of the recordings in September 2017, when the police informed them defendants had made recordings of them.

Mr. Bick personally installed one of the Nest security cameras and knew the camera captured portions of plaintiffs' backyard. He tried to "tweak down the camera to not focus on the property. If it was incidentally looking at it . . . that was not [his] focus. That's why [he] had to readjust it and focus on the staircase landing."

Defendants' Nest surveillance camera included a single microphone that was capable of recording a normal conversation

5

60 feet away. When Mr. Bick installed the Nest surveillance camera on April 21, 2017, he understood the camera could record loud audible sounds coming from plaintiffs' property. Defendants eventually replaced their single surveillance camera with three new cameras, and each new surveillance camera included three microphones that captured sound at the same distance as the other single microphone camera.

Also included with plaintiffs' opposition evidence was a flash drive, labeled Exhibit 12, which contained recordings from the Nest system, and an iPhone recording made by defendants. The recordings purport to show the extent of the privacy invasion. In his declaration, Mr. Mezger testified that in the videos, he and his guests were speaking at "normal conversational tones" and did not know they were being recorded.

We quote below the trial court's thorough description of the files contained in Exhibit 12.

"1. A file named '1—Exhibit No. 11—Mezger Backyard Yelling V1 3.16.17.m4a' [is an audio recording] which is 35 seconds in length and consists of little comprehensible audio. The Court can ascertain a male voice using an expletive at approximately four seconds stating that: (1) someone called his cellphone; (2) he told them to come up here; [and] (3) using an expletive a second time. This recording also consists of a female voice using an expletive and voices speaking at the same time from the 19 second mark until the end of the recording.

"2. A file named '2—Exhibit No. 12—Mezger Backyard Yelling V2 3.16.17.m4a' [is an audio recording] which is 22 seconds in length and consists of numerous parties speaking with expletives being used throughout the conversation. The sound is barely audible. A male voice is heard saying '[inaudible]

6

10:30 . . . you can do whatever you want at 10:30 [inaudible] . . . everyone's got attorneys [inaudible].'

"3.  A file named '3—Exhibit No. 38—Jeff Mezger Threat FULL 9.16. 17 at 909 PM.'  This file is from the Nest security system that is placed on Griffin's second floor patio.  It is a video recording that contains audio.  You can see Griffin's patio, steps leading down to her backyard, and trees in her backyard from this video recording.  This specific video recording shows very little of Plaintiffs' backyard as the recording was taken at night.  In this recording, Mr. Mezger is saying 'Hey, Randy, go f**k yourself, seriously you called on my grandkids at 9 o'clock?  You're not even the f***king owner.  You're stuck with a f*****g bald d**e who, uh, Donald Trump kinda put the heat on.  Now you're calling the cops?  F**k You, and f**k Kathy.  You're not our f*****g neighbor, you're a f*****g a*****e.'  At 34 seconds a female voice states 'What's going on?'  Mr. Mezger then says 'let's declare war.'  Mr. Mezger then proceeds to continue speaking in a loud voice and using expletives toward Griffin and Bick. Mr. Mezger's voice is clearly heard on this recording and his voice is the first voice heard on this particular recording. Mrs. Mezger's voice can also be heard on this recording.  This recording is 1 minute and 44 seconds in length.

"4.  A file named '6—Kathy Intimidation With Kids 5.4.18.'  This file is from the Nest security system that is placed on Griffin's second floor patio.  It is a video recording that contains audio.  The primary focus of the video is on Griffin's patio, steps leading down to her backyard, and trees in her backyard.  You can only see a small part of Plaintiffs' property on this recording.  The audio on this recording consists of numerous people speaking

and the audio is not clearly comprehensible as it has a lot of static.

"5. A file named '7—Mezger Pool Party 9.16.17.' This file is from the Nest security system that is placed on Griffin's second floor patio. It is a video recording that contains audio. It was recorded in the daylight hours. The primary focus of the video is Griffin's patio, steps leading down to her backyard, and trees in her backyard. You can only see a relatively small portion of Plaintiffs' backyard and the corner of what appears to be Plaintiffs' pool, and this view appears to be incidental to the focus of the video on Griffin's property. At no point do you see any people in the recording. The recording consists of very little comprehensible audio.

"6. A file named '9—Clip (May 25[,] 2017 at 1059 PM).' This file is from the Nest security system that is placed on Griffin's second floor patio. It is a video recording that contains audio. The primary focus of the video is Griffin's patio, steps leading down to her backyard, and trees in her backyard. You can see a small portion of Plaintiffs' patio, which is lighted; however, the rest of their property cannot be seen as the video was taken during the nighttime hours. The audio on this recording consists of numerous people speaking and most of the audio is not clearly comprehensible as it has a lot of static. This recording is 25 seconds in length.

"7. A file named '9—IMG_4360.' This file is from the Nest security system that is placed on Griffin's second floor patio. It is a video recording that contains audio. It was recorded in the daylight hours. The primary focus of the video is Griffin's patio railing and a portion of Griffin's backyard. The video also shows a portion of Plaintiffs' backyard with a gathering of about

8

people moving in Plaintiffs' backyard during the 6 second recording. The audio on this video recording consists only of loud music.

"8. A file named '10—Clip (May 25[,] 2017 at 1100 PM(1)).' This file is from the Nest security system that is placed on Griffin's second floor patio. It is a video recording that contains audio. The primary focus of the video is Griffin's patio, steps leading down to her backyard, and trees in her backyard. You can see only a small portion of Plaintiffs' patio, which is lighted, and you cannot see any people in this recording as it was taken during the nighttime hours. The audio on this recording consists of numerous people speaking loudly and most of the audio is not clearly audible as it has a lot of static and music playing. This recording is 29 seconds in length; however, the audio cuts off at 25 seconds.

"9. A file named '11—Clip (May 25[,] 2017 at 1100 PM).' This file is from the Nest security system that is placed on Griffin's second floor patio. It is a video recording that contains audio. The primary focus of the video is Griffin's patio, steps leading down to her backyard, and trees in her backyard from this video recording. You can see into a small portion of Plaintiffs' backyard, however, you cannot see any people in this recording as it was taken during the nighttime hours. The audio on this recording consists of numerous people speaking loudly and most of the sound is not clearly audible as it has a lot of static and music playing.

"10. A file named '12—Clip (May 25[,] 2017 at 1102 PM(1)).' This file is from the Nest security system that is placed on Griffin's second floor patio. It is a video recording that contains audio. The primary focus of the video is Griffin's patio,

9

steps leading down to her backyard, and trees in her backyard. You can see a small part of Plaintiffs' patio, which is lighted; however, you cannot see any people in this recording as it was taken during the nighttime hours. The audio on this recording consists of numerous people speaking loudly and most of the audio is not clearly audible as it has a lot of static. From what is audible the Court can hear a few expletives along with a few phrases.

"11. A file named '13—Clip (May 25[,] 2017 at 1102 PM).' This file is from the Nest security system that is placed on Griffin's second floor patio. It is a video recording that contains audio. The primary focus of the video is Griffin's patio, steps leading down to her backyard, and trees in her backyard. You can see a small part of Plaintiffs' lighted patio; however, you cannot see any people in this recording as it was taken during the nighttime hours. The audio on this recording consists of numerous people speaking loudly and most of the audio is not clearly audible as it has a lot of static. From what is audible the Court can ascertain a few expletives along with a few phrases[, like 'my hair is wet,' 'where's Becky's camera,' and 'oh my God'].

"12. A file named '14—Clip (May 25[,] 2017 at 1104 PM((1)).' This file is from the Nest security system that is placed on Griffin's second floor patio. It is a video recording that contains audio. The primary focus of the video is Griffin's patio, steps leading down to her backyard, and trees in her backyard. You can see a small part of Plaintiffs' lighted patio; however, you cannot see any people in this recording as it was taken during the nighttime hours. The audio on this recording consists of numerous people speaking loudly and most of the audio is not

clearly audible as it has a lot of static.  From what is audible the Court can ascertain a few phrases.

"13.  A file named '15—Clip (May 25[,] 2017 at 1104 PM).' This file is from the Nest security system that is placed on Griffin's second floor patio.  It is a video recording that contains audio.  The primary focus of the video is Griffin's patio, steps leading down to her backyard, and trees in her backyard.  You can see a small part of Plaintiffs' lighted patio; however, you cannot see any people in this recording as it was taken during the nighttime hours.  The audio on this recording consists of numerous people speaking loudly and most of the audio is not clearly audible as it has a lot of static.  From what is audible the Court can ascertain a few phrases.

"14.  A file named '16—Clip (May 25[,] 2017 at 1105 PM).' This file is from the Nest security system that is placed on Griffin's second floor patio.  It is a video recording that contains audio.  The primary focus of the video is Griffin's patio, steps leading down to her backyard, and trees in her backyard.  You can see a small portion of Plaintiffs' lighted patio; however, you cannot see any people in this recording as it was taken during the nighttime hours.  The audio on this recording consists of numerous people speaking loudly and most of the audio is not clearly audible as it has a lot of static.  From what is audible the Court can ascertain a few comprehensible phrases.

"15.  A file named 'SOUTHHAMPTION (1) (INC 170916004587)_Red.'  This file is Bick reporting a disturbance at Plaintiffs' residence.  Bick stated that it was a loud party that sounded like adults shouting at one another as well as kids screaming in the pool."

For the February 19, 2020 hearing on the motion, the court issued a lengthy tentative ruling proposing to grant the motion. Following oral argument, the court took the matter under submission. On March 2, 2020, the court issued its ruling granting the motion.

Thereafter, plaintiffs filed an ex parte application asking the court to vacate its order granting the motion, and to allow further evidence in support of their opposition, such as expert testimony regarding the sensitivity of the cameras' microphones. The trial court granted the motion in part.

Plaintiffs filed a supplemental opposition, supported by additional evidence, including additional declarations by each plaintiff, further testifying to the characteristics of their backyard, use of their backyard, desire for privacy, and how they have ceased using their backyard due to defendants' invasion of privacy. Plaintiffs testified they "believed that [their] activities and communications within [their] backyard were entirely private and would not be overheard or recorded. [They] expected that [their] conduct and communications in [their] private backyard would remain private." They also provided declarations from two experts purporting to analyze the videos plaintiffs had submitted in support of their original opposition to the motion.

Certified Audio/Video Forensic Analyst Jim Hoerricks, provided a declaration in which he opined that "the sound of the voices on the recordings is amplified and sounds louder than the actual volume of the voices when they were recorded."

Certified Protection Professional Jeffrey Zwirn submitted a declaration testifying he has been "involved in the security survey, needs analysis, recommendations, design, installation, inspection, testing, maintenance, and monitoring of over

12

5,000 security systems." He opined defendants' Nest "cameras contain one or more amplified and highly sensitive microphones. These microphones are designed to pick up audio from all directions, which includes sounds happening off camera. Nest software automatically processes audio from each of the microphones and utilizes echo cancellation and noise suppression to enhance the clarity of the recorded sounds" and the cameras have the "ability to record sounds that in many instances would not be heard by the human ear." He also testified that "[n]ationally recognized industry standards and best practices require that outdoor security cameras do not surveil an adjacent property due to privacy concerns," and that the cameras could have been positioned so that they did not capture plaintiffs' property.

On March 16, 2020, the trial court granted the motion, finding the additional evidence did not create a material dispute and defendants' conduct had an "insubstantial impact on Plaintiffs' privacy interests." Plaintiffs dismissed their remaining claims, and this timely appeal followed.

## DISCUSSION

"[T]he party moving for summary judgment bears the burden of persuasion that there is no triable issue of material fact and that he is entitled to judgment as a matter of law." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 (*Aguilar*).) "Once the [movant] has met that burden, the burden shifts to the [other party] to show that a triable issue of one or more material facts exists as to [that] cause of action . . . ." (Code Civ. Proc., § 437c, subd. (p)(2); *Aguilar*, at p. 850.) The party opposing summary judgment "shall not rely upon the allegations or denials of its pleadings to show that a triable issue of material fact exists

13

but, instead, shall set forth the specific facts showing that a triable issue of material fact exists . . . ."  (§ 437c, subd. (p)(2).) A triable issue of material fact exists where "the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof."  (*Aguilar*, at p. 850.)

Our Supreme Court has made clear that the purpose of the 1992 and 1993 amendments to the summary judgment statute was " 'to liberalize the granting of [summary judgment] motions.' "  (*Perry v. Bakewell Hawthorne, LLC* (2017) 2 Cal.5th 536, 542; *Aguilar*, *supra*, 25 Cal.4th at p. 854.)  It is no longer called a "disfavored" remedy.  (*Perry,* at p. 542.)  "Summary judgment is now seen as a 'particularly suitable means to test the sufficiency' of the plaintiff's or defendant's case."  (*Ibid.*)  On appeal, "we take the facts from the record that was before the trial court . . . .  ' "We review the trial court's decision de novo, considering all the evidence set forth in the moving and opposing papers except that to which objections were made and sustained." ' "  (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1037, citation omitted.)

### 1.    Common Law Invasion of Privacy

The elements of a common law invasion of privacy claim are intrusion into a private place, conversation, or matter, in a manner highly offensive to a reasonable person.  (*Huntingdon Life Sciences, Inc. v. Stop Huntingdon Animal Cruelty USA, Inc.* (2005) 129 Cal.App.4th 1228, 1259.)  In determining the existence of "offensiveness," one must consider:  "(1) the degree of intrusion; (2) the context, conduct and circumstances surrounding the intrusion; (3) the intruder's motives and objectives; (4) the setting into which the intrusion occurs; and (5) the expectations of those

14

whose privacy is invaded." (*Sanchez-Scott v. Alza Pharms.* (2001) 86 Cal.App.4th 365, 377.)

"Actionable invasions of privacy must be sufficiently serious in their nature, scope, and actual or potential impact to constitute an egregious breach of the social norms underlying the privacy right.  Thus, the extent and gravity of the invasion is an indispensable consideration in assessing an alleged invasion of privacy." (*Hill v. National Collegiate Athletic Assn.* (1994) 7 Cal.4th 1, 37 (*Hill*).)  The impact on the plaintiff's privacy rights must be more than "slight or trivial." (*Ibid*.)

"Whether a legally recognized privacy interest is present in a given case is a question of law to be decided by the court. . . . Whether plaintiff has a reasonable expectation of privacy in the circumstances and whether defendant's conduct constitutes a serious invasion of privacy are mixed questions of law and fact. If the undisputed material facts show no reasonable expectation of privacy or an insubstantial impact on privacy interests, the question of invasion may be adjudicated as a matter of law." (*Hill, supra,* 7 Cal.4th at p. 40, citations omitted.)

Here, defendants provided evidence they had legitimate safety concerns because of Ms. Griffin's status as a public figure and past death threats and stalking.  They also presented evidence their recordings were made exclusively from Ms. Griffin's property, only captured sounds that could be heard from their property, and any video of plaintiffs' property was incidental to their interest in securing defendants' second story bedroom.

Plaintiffs argue this case presents an issue of first impression:  "Do residents have a reasonable expectation of privacy concerning constant audio/video surveillance of their

15

private, walled backyard?"[1]  This is hyperbole.  Defendants do not dispute residents have a right to privacy in their home and backyard.  The question here is, did plaintiffs create a material factual dispute whether defendants' cameras intruded on their right to privacy in a highly offensive or serious manner?

Plaintiffs argue defendants' claimed security interests are mere pretext, and their real purpose was to surveille plaintiffs, arguing that defendants did not install cameras until after the HOA declined to take action against plaintiffs, admitted they intended to record plaintiffs, and reviewed the footage daily to find recordings of plaintiffs.  Plaintiffs also argued there were less intrusive means for defendants to protect their security interests, such as tilting or moving the cameras.

We conclude there is no material dispute regarding the offensiveness or seriousness of the intrusion.  There was no evidence repositioning the cameras would adequately safeguard defendants' security interests, or that those interests were pretext.  Defendants never testified they intended to surveille plaintiffs; instead, they testified that they sought to document the impact of plaintiffs' loud parties on their property.  Only a small portion of the plaintiffs' backyard could be seen in the videos, plaintiffs and their guests could barely be seen, if at all, and the content of their conversations could not be discerned.

---

[1]    Plaintiffs rely on many cases interpreting privacy in the context of government searches and seizures.  These authorities are not useful in deciding the issues presented in this case.  Those cases involve government surveillance, whereas this case involves a private security system that no party disputes defendants were entitled to have.

What few words and phrases could be understood were clearly spoken at elevated volumes, which plaintiffs could not reasonably expect to remain private in an outdoor residential setting, with neighbors nearby.  Plaintiffs' declarations testifying to their expectation of privacy do not create a material dispute by contradicting what can be plainly observed from the recordings. (See, e.g., *Scott v. Harris* (2007) 550 U.S. 372, 380.)

Even if the Nest cameras enhanced the clarity of the recorded sounds, and were more sensitive than the human ear, *the content of plaintiffs' conversations was still barely audible.* Any impact on plaintiffs' privacy interests was therefore insubstantial as a matter of law.

**2.    Constitutional Invasion of Privacy**

"The right to privacy in the California Constitution sets standards similar to the common law tort of intrusion." (*Hernandez v. Hillsides, Inc.* (2009) 47 Cal.4th 272, 287.)  Both causes of action require consideration of the nature of any intrusion upon reasonable expectations of privacy, and the offensiveness or seriousness of the intrusion, including any justification and other relevant interests.  (*Id*. at p. 288.)  As discussed *ante*, no serious privacy invasion occurred here.

**3.    Penal Code Section 632**

Penal Code section 632, subdivision (a), provides: "A person who, intentionally and without the consent of all parties to a confidential communication, uses an electronic amplifying or recording device to eavesdrop upon or record the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device" shall be subject to certain penalties.  Section 637.2 authorizes a private right of

17

action for any violation of section 632. Section 632 defines a confidential communication as "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto, but excludes a communication made in a public gathering or in any legislative, judicial, executive, or administrative proceeding open to the public, or in any other circumstance in which the parties to the communication may reasonably expect that the communication may be overheard or recorded." (*Id.*, subd. (c).) "A conversation is confidential if a party to that conversation has an objectively reasonable expectation that the conversation is not being overheard or recorded." (*Flanagan v. Flanagan* (2002) 27 Cal.4th 766, 768.)

The few discernable words and phrases recorded by defendants were spoken at elevated volumes, which plaintiffs could not reasonably expect to remain private in an outdoor residential setting, with neighbors nearby.

**4.     Request for Judicial Notice**

Defendants request this court take judicial notice that Ms. Griffin sold her home in December 2020. Because the grant deed was not part of the record below, and is irrelevant to resolution of this appeal, the request is denied.

## DISPOSITION

The judgment is affirmed. Respondents are awarded their costs on appeal.


                                        GRIMES, Acting P. J.


        WE CONCUR:

                    STRATTON, J.            WILEY, J.


18